STATE OF CONNECTICUT *v.* RONALD E. HALL
(AC 30081)

Flynn, C. J., and Harper and West, Js.

Argued January 5—officially released March 30, 2010

*Kevin Murray Smith*, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, and *Matthew A. Crockett*, assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, C. J. The defendant, Ronald E. Hall, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4) and larceny in the second degree in violation of General Statutes § 53a-123 (a) (3). On appeal, he claims that (1) there was insufficient evidence to support his conviction, (2) the trial court improperly admitted videotape evidence and (3) the prosecutor engaged in impropriety that deprived the defendant of a fair trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the night of June 11, 2007, Shamaila Riaz and Michael Purcell were working in the Best Way gasoline

station and convenience store in Moosup. At approximately 9:30 p.m., the defendant, who wore a black covering over his nose and mouth, entered the store, pointed a silver handgun at Riaz with his left hand and demanded money, threatening to kill her if she did not comply. Riaz testified that the man was a Caucasian in his mid-forties with "a big belly" and was approximately five feet, ten inches in height. She described his facial covering as a "black winter mask." Purcell described the man as an "older" Caucasian with black hair, approximately five feet, nine inches or five feet, ten inches in height, who was "kind of heavyset." He testified that the covering on the defendant's face was a black winter-type scarf. After Riaz had given the defendant the approximately $400 that was in the cash register, the defendant ran out of the store. Riaz chased after the defendant, running outside and shouting in an attempt to attract attention.

Outside the gasoline station, six teenage boys in the area heard Riaz' shouts and saw the defendant running away from the scene. Ryan Tetreault, one of the teenagers outside the store, testified as follows. Tetreault and five friends had just come out of a nearby Cumberland Farms store near the Best Way gasoline station when they encountered Riaz yelling that she had been robbed. Tetreault had known the defendant prior to the evening in question; Tetreault's grandmother is the sister-in-law of the defendant's brother, Thomas Hall. Tetreault and his friends chased after the defendant, eventually cornering him in a nearby fenced-in parking lot. The defendant then pointed his gun at the teenagers, and the covering over his face fell down. It was then that Tetreault, who was approximately four to five feet away, recognized the defendant. The defendant subsequently ran to a nearby parking lot, got into a maroon, four door Volkswagen Passat and drove away. Tetreault previously had seen the defendant driving the same car.

Local police arrived at the scene shortly after the defendant had fled. Officers interviewed the witnesses and viewed a video from a surveillance system within the store. On the basis of their investigation, the police suspected the defendant to be the perpetrator. They proceeded to the defendant's house, where, after a period of surveillance, they announced their presence, and the defendant met them without protest. The defendant spoke willingly to the police, and he provided three different accounts of his whereabouts during the time of the robbery. A search, executed pursuant to a warrant, of the defendant's home revealed .25 caliber handgun ammunition. Police found a black scarf on the passenger side floor of the defendant's red Volkswagen automobile. Neither the handgun used in the robbery, nor the stolen proceeds ever were located. The defendant subsequently was arrested and was charged with one count of robbery in the first degree in violation of § 53a-134 (a) (4) and one count of larceny in the second degree in violation of § 53a-123 (a) (3).

The other five teenagers who were with Tetreault— Jeremy Porter, Nicholas Coffey, Timothy Kuuttila, Zachary Holden and Joseph Holden—testified at trial in a substantially similar manner as did Tetreault regarding the events of the evening. Porter, who was Tetreault's roommate, testified that when the defendant turned around, the covering over his face fell down, and Porter was able to see the defendant's face. The remaining teenagers testified that they, along with Tetreault and Porter, had chased the man they saw running away from the Best Way but were unable to identify the defendant, and none of them testified that he was able to see the man's face. Each of the teenagers testified as to the man's physical characteristics. Coffey testified that the man was a Caucasian of "medium set" build, approximately thirty-seven to forty years old and approximately five feet, ten inches in height. Kuuttila

testified that the man was a Caucasian with a "kind of meaty" build, in his thirties, about five feet, eight inches tall, with black hair. Zachary Holden described the man as a Caucasian with a "chunky" build, between thirty-five and forty years old, slightly less than six feet in height, with "brownish . . . darkish" hair. Joseph Holden testified that the man was a Caucasian who was "a little bit heavyset," about thirty-five to forty years old, approximately five feet, ten inches tall, with "darker hair." Each of the teenagers stated that the man had a dark colored covering over the lower part of his face and that he carried a pistol. Coffey, Zachary Holden and Joseph Holden described the man's car as being "red," "red" and "purple or a dark red" in color, respectively. At the time of trial, the defendant was a heavyset Caucasian male, had dark hair and was approximately five feet, eight inches tall. He also was the registered owner of a red, 2003 Volkswagen Passat.

The state also presented the testimony of Elizabeth Mack. Mack testified that on the evening in question, she and her husband were driving in the area of the Best Way gasoline station when she saw the defendant standing on the side of the store "with something over his face [and] breathing very heavily." Mack stated that she told her husband, who was driving at the time, of the defendant's presence and of her impression that the defendant "look[ed] like [he was] pumping himself up to rob the store." Mack testified that she had known the defendant for approximately seven years and that she had known him through her acquaintance with his wife. She further stated that she had seen the defendant on about four or five occasions in the period since she had known him, that the defendant had been to her house a few times, that he had built a computer for her son and that he had attempted to install memory cards in her computer.

At the close of the state's case, the defendant moved to dismiss the charges against him on the ground that the state had failed to meet its burden of proof. The court denied the motion. Following the close of evidence, the jury returned a verdict of guilty as to each count. The court sentenced the defendant to a total effective term of fifteen years imprisonment, execution suspended after ten years, to be followed by five years probation. This appeal followed. Additional facts will be provided where necessary.

## I

The defendant first claims that the evidence was insufficient to sustain his conviction. Specifically, he argues that the state failed to prove identity, claiming that "[e]ven viewed in the light most favorable to sustaining the verdict, no jury reasonably could have concluded that the evidence established beyond a reasonable doubt that [the defendant] was the perpetrator" of the crimes charged. We disagree.

We initially set forth the applicable standard of review. "The standard governing our review of sufficiency of evidence claims is well established. In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the jury reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Cox*, 293 Conn. 234, 245, 977 A.2d 614 (2009).

The defendant primarily challenges the eyewitness testimony presented by the state identifying him as the man who demanded money at gunpoint from Riaz and then fled in a red Volkswagen Passat. He characterizes the testimony of Tetreault and Porter as "underwhelming at best," argues that it was internally inconsistent and contends that inconsistencies between the accounts of Tetreault and Porter and the other teenagers render the identifications by Tetreault and Porter unreliable. The defendant also highlights the fact that Tetreault and Porter were roommates, maintaining that this "further impugns their identification testimony." The defendant also describes Mack's testimony identifying him as "equally flawed and unreliable." The defendant finally claims that the videotape evidence was insufficient to establish his identity as the perpetrator beyond a reasonable doubt.

Following our review of the record, we conclude that the evidence was sufficient to sustain the defendant's conviction. The state offered three eyewitnesses who positively identified the defendant: Tetreault, Porter and Mack. Significantly, two of these witnesses knew the defendant prior to June 11, 2007. Tetreault's grandmother was related to the defendant's brother by marriage, and Tetreault knew the defendant prior to that evening. Mack also previously was acquainted with the defendant. Porter's account of the relevant events was substantially the same as Tetreault's. The jury heard evidence that he and Tetreault were roommates and, thus, was able to credit or discount Porter's identification accordingly as it saw fit. Mack also testified as to the circumstances under which she saw the defendant and the extent of her relationship and knowledge of him prior to the evening of the robbery.

There also was testimony from Riaz and Purcell and Coffey, Kuuttila, Zachary Holden and Joseph Holden, the other teenagers who had chased the defendant.

Although these witnesses did not know the defendant and were not able to identify him, each presented testimony as to the physical characteristics of the man they saw. The physical descriptions differed slightly in detail, but they substantially were similar.

The portion of the defendant's claim pertaining to the videotape evidence also is without merit. The videotape was a portion of the evidence presented by the state to establish the identity of the perpetrator of the crimes charged. The state also put forth substantial additional evidence, as has been detailed previously. Viewing the record evidence as a whole, as we must, it is of no moment that the videotape, considered in artificial isolation, may not have proven the defendant's identity beyond a reasonable doubt. The entirety of the evidence was sufficient to support the defendant's conviction.

The flaw in the defendant's argument is that, in substance, his challenge is to the *credibility* of the witnesses, rather than the *sufficiency* of the evidence against him. His claim thus asks this court, in effect, to judge the credibility of the witnesses. This we cannot do. In assessing the evidence at trial, "it is the jury's role as the sole trier of the facts to weigh the conflicting evidence and to determine the credibility of witnesses. . . . It is the right and duty of the jury to determine whether to accept or to reject the testimony of a witness . . . and what weight, if any, to lend to the testimony of a witness and the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Moye*, 112 Conn. App. 605, 610, 963 A.2d 690, cert. denied, 291 Conn. 906, 967 A.2d 1221 (2009). Furthermore, as a court of appellate review, "we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support

the jury's verdict." (Internal quotation marks omitted.) *State* v. *Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005).

## II

The defendant next claims that the court improperly allowed to be admitted videotape evidence depicting the robbery of the Best Way store. He argues that the videotape should not have been admitted due to the circumstances under which the tape had been created. Because the defendant did not preserve this issue at trial and the claim is not of constitutional magnitude, we decline to review the claim.

The following additional facts underlie this claim. The state offered the VHS videotape, which depicted the inside of the Best Way store at the time of the robbery, as an exhibit during Riaz' testimony. Riaz testified that the videotape fairly and accurately depicted the incident in question. Upon the state's offer of the videotape as a full exhibit, the defendant offered no objection. Later in the trial, Detective Steven Berthiaume of the Plainfield police department testified as to how the videotape had been produced. Berthiaume stated that because the in-store surveillance system was digital and did not offer the capability of reproduction, he recorded the images with a handheld camera and later transferred the recording to a VHS tape. He admitted that the images on the videotape were not as clear as the images on the in-store system. The defendant never challenged the videotape and made no motion to strike the evidence on the basis of the facts pertaining to the origin of the videotape, as revealed by Berthiaume.

The defendant asks this court to review his unpreserved claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). He characterizes the

claim as one of constitutional dimension,[1] arguing that the manner in which the videotape was created and its admission during Riaz' testimony implicates his right to confront and to cross-examine adverse witnesses. We do not agree with the defendant's characterization; his claim is an evidentiary one. As with any item of evidence proffered by the state, the defendant had a right and opportunity to investigate the foundation of the videotape, including its origin, through cross-examination. The defendant did not avail himself of this opportunity when the state offered the videotape through Riaz, and he offered no objection to its being entered as a full exhibit. Furthermore, when the facts concerning the videotape's origin came to light during Berthiaume's testimony, the defendant did not challenge the prior admission of the videotape by moving to strike it.

We will not review under *Golding* evidentiary claims labeled as constitutional claims. See *State* v. *Richard W.*, 115 Conn. App. 124, 136–37, 971 A.2d 810, cert. denied, 293 Conn. 917, 979 A.2d 493 (2009). We, therefore, decline to review this claim.

### III

The defendant's final claim is that the prosecutor committed impropriety during the course of his cross-examination of the defendant. The defendant argues that "the record reflects that the prosecutor improperly questioned the defendant about prior misdemeanor convictions that ranged from [fifteen to twenty-one] years old and had no bearing whatsoever on his veracity. As such they were improper fodder for impeachment and plainly inadmissible." We are unable to

---

[1] In order to gain *Golding* review of a claim not preserved at trial, the defendant's claim on appeal must be "of constitutional magnitude alleging the violation of a fundamental right . . . ." *State* v. *Golding*, supra, 213 Conn. 239–40.

conclude from the record that the prosecutor committed impropriety during his examination of the defendant.

Defense counsel did not object to any of the questions posed by the prosecutor regarding the defendant's prior convictions. Where an instance of prosecutorial impropriety is not objected to at trial, we need not conduct the four part analysis of unpreserved claims provided for by *State* v. *Golding*, supra, 213 Conn. 239–40, but instead apply the factors enumerated in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987), to determine whether the impropriety deprived the defendant of his right to a fair trial. *State* v. *Stevenson*, 269 Conn. 563, 572–75, 849 A.2d 626 (2004). However, to reach this level of analysis, we first must conclude that the prosecutor's actions were improper. "In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 551, 949 A.2d 1092 (2008).

During his cross-examination, the prosecutor asked the defendant: "[W]ould it surprise you if I told you [that] you had a case involving the charge of harassment?" With regard to the harassment charge, which he indicated occurred in 1987, the prosecutor further inquired: "Would it also surprise you that you were convicted for not going to court?" The defendant did not respond directly to these questions. The prosecutor did not state the specific statutory provision under which the defendant had been charged. The prosecutor proceeded to ask the defendant whether he was "surprised" to learn that he also had been convicted of failure to appear in court on a breach of the peace

charge in 1993. The defendant answered in the affirmative, and the prosecutor ceased the line of questioning. Again, the prosecutor did not state what degree of the crime of breach of the peace was involved.

A witness may be impeached with evidence of his prior felony convictions. "For the purpose of impeaching the credibility of a witness, evidence that a witness has been convicted of a crime is admissible if the crime was punishable by imprisonment for more than one year." Conn. Code Evid. § 6-7 (a). Misdemeanor convictions, however, may not be used to impeach a witness; see *State* v. *Ruscoe*, 212 Conn. 223, 247, 563 A.2d 267 (1989), cert. denied, 493 U.S. 1084, 110 S. Ct. 1144, 107 L. Ed. 2d 1049 (1990); unless the defendant has opened the door to the admission of the evidence. See *State* v. *Phillips*, 102 Conn. App. 716, 733–36, 927 A.2d 931, cert. denied, 284 Conn. 923, 933 A.2d 727 (2007).

The prosecutor questioned the defendant about two prior convictions of failure to appear relating to charges of harassment and breach of the peace. Neither the defendant nor any of his witnesses testified as to charges or convictions of these crimes prior to the prosecutor's questions. Both harassment and breach of the peace may be either a felony or a misdemeanor depending on the nature of the underlying conduct. See General Statutes §§ 53a-182b and 53a-183 (harassment); and General Statutes §§ 53a-180aa and 53a-181 (breach of the peace). A conviction of failure to appear also may be either a felony; see General Statutes § 53a-172; or a misdemeanor; see General Statutes § 53a-173; depending on the nature of the underlying charges.

Therefore, for the purposes of the present case, in order to determine whether the defendant's prior convictions of failure to appear were felonies—and, therefore, properly the subject of impeachment—or

misdemeanors—generally not the proper subject of impeachment—we would require knowledge of the nature of the charges underlying those convictions. There is nothing in the record that would allow us to make these determinations. As noted, the prosecutor's questioning did not include statutory citations, nor did defense counsel object to the questioning or inquire as to the nature of the charges and convictions referenced. Furthermore, at oral argument before this court, counsel for the defendant, when provided the opportunity to show that there was something in the record that could demonstrate that the charges and convictions were misdemeanors, could not do so.[2] The defendant's claim as to the prosecutor's questions concerning prior convictions lacks an adequate record to permit review.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[2] While we lack an adequate record to review the specific claim the defendant raises, we place no imprimatur on the "would it surprise you" form of question asked of the defendant concerning his prior failures to appear. If they were in fact misdemeanors, they should not have been used for impeachment purposes. If they were felonies, § 6-7 (b) of the Connecticut Code of Evidence provides for the following methods of proof: "(1) examination of the witness as to the conviction, or (2) introduction of a certified copy of the record of conviction into evidence, after the witness has been identified as the person named in the record."

We agree with Professor Bennett Gershman that the better procedure in such cases, as followed in the federal courts, is to permit "[i]mpeachment by prior [felony] convictions . . . only when the prosecutor has a certified record of the conviction or the judge rules that the prosecutor has presented sufficiently reliable proof of the conviction to allow examination." B. Gershman, Prosecutorial Misconduct (2d Ed. 2009) § 10:3, p. 398, citing *Reed* v. *United States*, 485 A.2d 613 (D.C. 1984).