IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32318-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM PATRICK MCBRIDE, | ) | OPINION PUBLISHED IN PART |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. —Whitman County offered plea bargains to Kenneth Himes and Sheila Evans under which they would be charged with only two crimes for a rash of burglaries in which they were involved if they revealed the location of the stolen property. They were also required by their plea bargain to testify against the defendant, William McBride, whom they implicated in two of the crimes.

The trial against Mr. McBride pitted the credibility of the only defense witness— Mr. McBride's girlfriend, Amy Baird—against the credibility of Mr. Himes and Ms. Evans. Mr. McBride contends on appeal that the trial court abused its discretion in allowing the State to impeach Ms. Baird with evidence about a prior conviction exceeding what is permitted by ER 609(a), and that he was prejudiced by prosecutorial vouching for State witnesses through testimony and argument, and by the prosecutor's

explicit statement, in closing argument, that Ms. Baird had lied. Insofar as his own lawyer should have objected to the misconduct and sought curative action by the court, Mr. McBride alleges ineffective assistance of counsel.

In the published portion of this opinion, we hold that ER 608(b) permits impeachment only by specific acts that have not resulted in conviction, while impeachment by way of criminal conviction is treated exclusively under ER 609. The trial court abused its discretion in admitting more conviction evidence against Ms. Baird than is permitted under ER 609.

In the unpublished portion of this opinion, we hold that the State engaged in prosecutorial misconduct and that Mr. McBride received ineffective assistance of counsel. Given the central importance of credibility to the State's case, the errors, collectively, were not harmless. We reverse and remand for a new trial.[1]

## FACTS AND PROCEDURAL BACKGROUND

In November and December 2013, the Whitman County Sheriff's Office received reports of a rash of burglaries in the northern part of the county. Among them were a report by Dominic Petrovich that two motorcycles were stolen out of his carport in

---

[1] Given our disposition of the case, we do not address Mr. McBride's argument that the trial court erred by imposing a deoxyribonucleic acid (DNA) collection fee or issues raised in his statement of additional grounds. In connection with the challenge to the court's imposition of a $100 DNA collection fee, we point out this court's recent decision in *State v. Thornton*, 188 Wn. App. 371, 353 P.3d 642 (2015).

Rosalia on the night of November 17 and a report by Fred Wagner in mid-December that his storage unit in Tekoa had been broken into and been "all but cleaned out." Report of Proceedings (RP) at 41. A yellow CanAm four-wheeler and a Kubota utility vehicle were also taken at around the same time from Arlo Huber's residence north of Tekoa.

Law enforcement initially had no leads as to who committed the burglaries, and believed they had reached a dead end. But when Deputy Michael Jordan had occasion in late December to speak to Amy Baird, who he was investigating in connection with an unrelated matter, he asked if she knew anything about the burglaries. Ms. Baird, the longtime girlfriend of William McBride, gave him the names of two individuals, Lance Garrett and Stan Lowley, whom she claimed to have heard were involved in different thefts in the Tekoa area.

Police officers investigated Mr. Lowley's property in Idaho, located just across the border from Tekoa, where Mr. Garrett was also living. While there, Deputy Jordan found two motorcycles, which he confirmed had the same vehicle identification numbers as those stolen from Mr. Petrovich. He also observed a yellow four-wheeler and a Kubota matching the description of the ones that had been taken from the residence of Mr. Huber. From their interview with Mr. Lowley and Mr. Garrett, the officers learned that Mr. Himes may have been involved in stealing the Kubota and the four-wheeler.

On December 28, Deputy Jordan arrested Mr. Himes in connection with the burglary of Mr. Huber. Although Mr. Himes initially refused to talk to police, the

3

officers eventually offered to reduce the charges he would face from multiple burglaries to only two counts of second degree possession of stolen property if he agreed to give them a statement as to where the rest of the stolen property was located. Believing that Mr. Himes's girlfriend Sheila Evans was involved, the State offered her a plea deal under which she would plead guilty to one count of burglary in the second degree and pay restitution. Both Mr. Himes and Ms. Evans had implicated Mr. McBride and were required to testify truthfully on that score at trial. Both agreed to the deals.

Deputy Jordan learned from his interview of Mr. Himes that Mr. Himes was central to most of the recent burglaries, if not the ringleader. Mr. Himes and Ms. Evans told police that they, along with Mr. McBride, had broken into Mr. Wagner's storage unit. Mr. Himes also told police that he had stolen Mr. Petrovich's motorcycles from Rosalia on December 18, with some help from Mr. McBride and another individual named Donnie Rower. Mr. Himes said he stole the smaller motorcycle by himself before going back to his place in Oakesdale in order to have Mr. McBride and Mr. Rower help him load the larger motorcycle into a trailer.

Mr. McBride was charged with second degree burglary based on his alleged involvement in the Tekoa storage unit theft. He was charged with theft of a motor vehicle, as either an accomplice or a principal, based on his alleged participation in stealing Mr. Petrovich's larger motorcycle.

4

No. 32318-8-III
*State v. McBride*

At trial, the State's principal witnesses were Mr. Himes and Ms. Evans. Although Mr. McBride did not testify at trial, Ms. Baird testified for the defense. We reserve most of our discussion of the evidence and argument at trial to the unpublished portion of this opinion, where it is relevant to the State's argument that any error was harmless.

Relevant to the ER 608/609 issue, the State cross-examined Ms. Baird at trial about an occasion in 2013 when Mr. McBride lied to police about his name and Ms. Baird had gone along with the misrepresentation, resulting in her conviction for making a false statement to a police officer.[2] The prosecutor inquired about the facts underlying the charge rather than the conviction itself. A defense objection that questioning about details of the crime exceeded what was permitted by ER 609 was overruled. The prosecutor's continued questioning revealed not only the details of Ms. Baird's deceptive conduct on that occasion, but Mr. McBride's as well.

The jury found Mr. McBride guilty as charged. He was sentenced to 68 months in connection with the burglary and 43 months for the motor vehicle theft. He appeals.

ANALYSIS

Mr. McBride first claims that the trial court abused its discretion by allowing the

---

[2] Knowingly making an untrue statement to a public servant is proscribed by RCW 9A.76.020, and "is clearly a crime which involves a false statement and is admissible under ER 609(a)(2)." *State v. Burton*, 33 Wn. App. 417, 420, 655 P.2d 259 (1982), *rev'd on other grounds*, 101 Wn.2d 1, 676 P.2d 975 (1984), *overruled on other grounds by State v. Ray*, 116 Wn.2d 531, 543-45, 806 P.2d 1220 (1991).

5

prosecutor to elicit details from Ms. Baird about a prior misdemeanor conviction for making a false statement to a police officer in 2013. According to Mr. McBride, the line of questioning exceeded the permissible scope of ER 609(a). The State now argues that it was offering the evidence under ER 608(b). We begin with the trial record and then turn to evidence that may be admitted under the two rules.

On cross-examination, the prosecutor asked Ms. Baird if she "only ever tell[s] the truth," to which she responded, "I do my level best." RP at 234. He then asked her whether she tells the truth to law enforcement, and if she would ever lie for Mr. McBride. After Ms. Baird responded that she would never lie for Mr. McBride when it comes to stealing, the prosecutor asked her if she would "lie about his name." *Id.* Ms. Baird acknowledged that she would, and that she had in fact done so:

> [PROSECUTOR]: You lied about his name in September of 2013—
> [MS. BAIRD]: Yes, I did—
> [PROSECUTOR]: —five months ago. Why?
> [MS. BAIRD]: I didn't necessarily—What I said was that William McBride was a big boy, he could stated [sic]—his name. I wasn't going to give information otherwise.
> [PROSECUTOR]: You didn't tell the police he was someone else?
> [MS. BAIRD]: Huh-huh.
> [PROSECUTOR]: You didn't tell them he was Dan McBride?
> [MS. BAIRD]: No. I mentioned Dan. I didn't say Dan McBride. I didn't say that was his name. I said, "Ask him, he's a big boy, he can (inaudible)."

RP at 234-35. Defense counsel objected to the prosecutor's line of questioning on the grounds that it went beyond what is permitted by ER 609. The court excused the jury,

and outside the presence of the jury, Mr. McBride's lawyer argued, "I think what [the prosecutor] would like to do is go down all of the specifics—but I think the evidence rule contemplates just the fact of the conviction." RP at 235.

The prosecutor argued the State should be able to question Ms. Baird regarding the details surrounding the conviction because it was not impeaching her with it and "she's obviously testifying to [it] freely and remembers it well." RP at 236. He did not say that he was offering the evidence under ER 608(b) or identify a rule other than ER 609 on which he relied. The court overruled the objection, noting that it "sounded [like] proper impeachment to me,—as the evidence of a conviction. So I'll overrule the objection." RP at 237.

The jury returned, and the prosecutor resumed questioning Ms. Baird about the circumstances of her offense:

> [PROSECUTOR]: Talking about an incident five months ago, where you lied to police *and got convicted for it, regarding William McBride. You were present with William and somebody else in Kennewick, Washington, in September of 2013?*
> [MS. BAIRD]: Yes.
> [PROSECUTOR]: Okay. And you were contacted by law enforcement there.
> [MS. BAIRD]: Yeah.
> [PROSECUTOR]: *And while there, did the defendant give a false name to the officers?*
> [MS. BAIRD]: Yes.
> [PROSECUTOR]: *Okay. Did he give the name of his brother Daniel?*
> [MS. BAIRD]: Yes.
> [PROSECUTOR]: And when you were asked by the officers, you said you had known Daniel a very long time, didn't you?

7

> [MS. BAIRD]: I have.
> [PROSECUTOR]: Okay. You've also known William a really long time, haven't you?
> [MS. BAIRD]: I have.
> [PROSECUTOR]: You didn't tell them that Daniel was really William McBride.
> [MS. BAIRD]: I didn't.

RP at 237-38 (emphasis added).

ER 608 and 609 both address evidence that may and may not be admitted for the purposes of attacking a witness's credibility. ER 609(a) states:

> For the purpose of attacking the credibility of a witness in a criminal or civil case, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness but only if the crime (1) was punishable by death or imprisonment in excess of 1 year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs the prejudice to the party against whom the evidence is offered, or (2) involved dishonesty or false statement, regardless of the punishment.

Mr. McBride does not dispute that Ms. Baird's 2013 misdemeanor conviction for false statement was admissible under ER 609(a), but argues that the cross-examination exceeded what is permitted under the rule. "Cross examination on prior convictions under ER 609(a) is limited to facts contained in the record of the prior conviction: the fact of conviction, the type of crime, and the punishment imposed." *State v. Coe*, 101 Wn.2d 772, 776, 684 P.2d 668 (1984); *State v. Copeland*, 130 Wn.2d 244, 284, 922 P.2d 1304 (1996). This is because "[c]ross examination exceeding these bounds is irrelevant and likely to be unduly prejudicial, hence inadmissible." *Coe*, 101 Wn.2d at 776. As the

8

court explained in *State v. Coles*, 28 Wn. App. 563, 573, 625 P.2d 713 (1981), "[t]he details of the acts leading to the prior convictions are not admissible" under ER 609 because "the only purpose of such information in a subsequent trial on an unrelated offense is to bring irrelevant evidence before the jury to insinuate that conviction of the prior offense somehow is proof of defendant's guilt in the present action."

The State did not mention ER 608(b) in offering the evidence in the trial court but argues on appeal that it is an independent and sufficient basis on which it could cross-examine Ms. Baird about the conduct for which she was convicted. ER 608(b) provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

The State argues that unlike ER 609, cross-examination under ER 608(b) is not limited to the fact of the conviction, the type of crime, and the punishment.

What the State does *not* address is whether ER 608(b) and ER 609 are intended to be mutually exclusive, with ER 608(b) applying only to conduct for which there has been no conviction. An ambiguity arises depending on whether the word "they" at the beginning of the second sentence of ER 608(b)—identifying the things that can be inquired into on cross-examination—means, "[s]pecific instances of conduct . . . for the

9

purposes of attacking . . . credibility," or means, instead, "[s]pecific instances of conduct . . . for the purposes of attacking . . . credibility, *other than conviction of crime as provided in rule 609.*" (Emphasis added.)

Federal courts have addressed this issue in cases applying the parallel federal rules. In a decision representative of the weight of federal authority, *United States v. Osazuwa*, 564 F.3d 1169, 1175 (9th Cir. 2009), the court held that "Rule 608(b) permits impeachment only by specific acts that have *not* resulted in a criminal conviction," while "[e]vidence relating to impeachment by way of criminal conviction is treated *exclusively* under Rule 609." (Emphasis added.)

In arriving at this conclusion, the *Osazuwa* court began by noting that "the interplay between Rules 608 and 609 is complex." 564 F.3d at 1173. It then turned to the text of Rule 608, which the court concluded was subject to two reasonable interpretations:

> Defendant argues that Rule 608 exempts from its coverage a witness' prior criminal convictions and instead delegates to Rule 609 any questions relating to such convictions. The government advances a different construction of Rule 608, arguing that the rule is concerned solely with the admissibility of extrinsic evidence. In the government's view, Rule 608 provides only that, while specific instances of the conduct of a witness may not be proved by extrinsic evidence, extrinsic evidence is admissible to prove criminal convictions.

10

*Id.* at 1173. Because the court found that both constructions were plausible and the rule was therefore ambiguous, it turned to the legislative history surrounding the rule's adoption, explaining that the advisory notes upon adoption of the rule provide:

> "[p]articular instances of conduct, *though not the subject of criminal conviction*, may be inquired into on cross-examination" and "*[c]onviction of crime* as a technique of impeachment *is treated in detail in Rule 609, and here is merely recognized as an exception to the general rule excluding evidence* of specific incidents for impeachment purposes." [Fed. R. Evid.] 608 advisory committee's notes (1972) (emphases added). Those comments suggest that evidence relating to convictions falls within the exclusive purview of Rule 609.

*Id.* at 1174 (first and second alterations in original). The court pointed out that the Eighth, Fifth, and Tenth Circuit Courts of Appeals had also adopted the defendant's construction. *Id.* (citing *United States v. Lightfoot*, 483 F.3d 876 (8th Cir. 2007); *United States v. Parker*, 133 F.3d 322 (5th Cir. 1998); and *Mason v. Texaco, Inc.*, 948 F.2d 1546 (10th Cir. 1991)).

The Ninth Circuit also recognized "the unfairness that would result if evidence relating to a conviction is prohibited by Rule 609 but admitted through the 'back door' of Rule 608." *Id.* at 1174 (citing Donald H. Zeigler, *Harmonizing Rules 609 and 608(b) of the Federal Rules of Evidence*, 2003 UTAH L. REV. 635, 677 (2003) ("Because the misconduct that forms the basis of the impeachment is exactly the same, it plainly seems unfair to forbid impeachment under Rule 609(a)(1) but allow the defendant to be questioned about the underlying acts under Rule 608(b).")). It further explained that

11

[u]nder the government's interpretation, a bad act resulting in a conviction would be, in a sense, counted twice—once by presenting the bad act itself and once by presenting the conviction that flowed from it. The risk of unfair prejudice or undue emphasis is the reason why Rule 609 and its related case law carefully guide the admission of prior convictions and their underlying facts.

*Id.* at 1174-75.

It is well settled that while federal case law interpreting a federal rule that is equivalent to a Washington rule may be persuasive, it is not binding. *State v. Brown*, 113 Wn.2d 520, 547-48, 782 P.2d 906 (1989); *see also State v. O'Dell*, 70 Wn. App. 560, 565, 854 P.2d 1096 (1993). Washington courts "approach our rules as though they had been drafted by the Legislature and give the words their ordinary meaning." *Brown*, 113 Wn.2d at 551-52. But federal case law applying Federal Rule of Evidence (Fed. R. Evid.) 608(b) is instructive given that the federal rule and our own are substantially the same.[3] *See State v. Wilson*, 60 Wn. App. 887, 892, 808 P.2d 754 (1991) (looking to

---

[3] Federal Rule of Evidence 608(b) states:
**(b) Specific Instances of Conduct.** Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of:
   **(1)** the witness; or
   **(2)** another witness whose character the witness being cross-examined has testified about.

12

federal case law as persuasive authority in interpreting ER 608(b) because "[t]his rule is identical to Fed. R. Evid. 608(b)").

While it appears that many states have adopted the federal approach,[4] at least seven—the states of Kentucky, Idaho, California, Colorado, Connecticut, Montana, and Nevada—have held that their parallel rules can be used even where the specific conduct results in a criminal conviction.[5] But in each of these jurisdictions, the state counterpart to Fed. R. Evid. 609 differs from the federal rule in a significant way: it permits use of a prior conviction to show a witness's untruthfulness only if the prior conviction was a felony, and does not allow proof that the witness was convicted of a misdemeanor, even if the crime involved dishonesty.[6] As the Kentucky Supreme Court observed in *Allen*,

---

[4] *See, e.g., State v. Stricklin*, 290 Neb. 542, 561, 861 N.W.2d 367 (2015) ("Rule 608(2) permits questioning during cross-examination only on specific instances of conduct not resulting in a criminal conviction.").

[5] *See Allen v. Commonwealth*, 395 S.W.3d 451, 463-64 (Ky. 2013) ("Nothing in the language of [Ky. R. Evid.] 608 suggests that so long as a proponent does not attempt to prove the conduct involved in a misdemeanor conviction by extrinsic evidence, simple inquiry about that conduct should be unacceptable."); *see also State v. Bergerud*, 155 Idaho 705, 711, 316 P.3d 117 (Ct. App. 2013); *People v. Chatman*, 38 Cal. 4th 344, 133 P.3d 534, 556, 42 Cal. Rptr. 3d 621 (2006); *People v. Drake*, 748 P.2d 1237, 1246 (Colo. 1988); *State v. Hall*, 120 Conn. App. 191, 991 A.2d 598, 604 (2010); *State v. Martin*, 279 Mont. 185, 926 P.2d 1380, 1389 (1996); *Butler v. State*, 120 Nev. 879, 102 P.3d 71, 80 (2004).

[6] *See Allen*, 395 S.W.3d at 463-64 ("Unlike the federal rule, [Ky. R. Evid.] 609 does not allow proof that the witness was convicted of a non-felony (usually a misdemeanor) involving dishonesty or reflecting on character for dishonesty."); *Bergerud*, 155 Idaho at 711 (noting that the federal rule "differs in a significant way from [Idaho R. Evid.] 609," which "permits use of a prior conviction to show a witness's

13

"the inability to inquire in any way about misdemeanor convictions reflecting on dishonesty illustrates a substantial hole in the present [Ky. R. Evid.] 608-609 regime." *Allen v. Commonwealth*, 395 S.W.3d 451, 463 (Ky. 2013). The court explained that under this system, "bar[ring] any evidence of misdemeanor conduct that led to a conviction—even when it conclusively proves dishonest conduct—[undermines] the ability to effectively cross-examine a witness." *Id.* at 464.

Notwithstanding this federal authority, the State suggests that our Supreme Court found both ER 608(b) and ER 609 applicable to prior crimes resulting in conviction in *State v. Clark*, 143 Wn.2d 731, 767, 24 P.3d 1006 (2001). In that case, the trial court had refused to allow the defense to impeach a State witness under ER 608(b) with conduct underlying his prior convictions, where the witness had already been impeached under ER 609 with the convictions themselves. On appeal, the defendant claimed the conduct was further evidence of the witness's truthfulness and would have assisted the jury in assessing his credibility. The Supreme Court held that the trial court did not abuse its discretion in excluding the impeachment evidence, explaining that "[f]ailing to allow cross-examination of a state's witness under ER 608(b) is an abuse of discretion if the witness is crucial and the alleged misconduct constitutes the only available

untruthfulness only if the prior conviction was a felony"); *see also* CAL. EVID. CODE § 788; COLO. REV. STAT. § 13-90-101; CONN. EVID. CODE § 6-7; IDAHO R. EVID. 609(a); KY. R. EVID. 609(a); NEV. REV. STAT. § 50.095; MONT. R. EVID. 609; *Olson v. Little*, 604 F. App'x 387, 397 n.5 (6th Cir. 2015).

14

impeachment." *Id* at 766. Since the credibility of the witness in *Clark* had already been challenged by admitting the convictions, "the misconduct underlying some of those convictions would not be any more probative." *Id.* at 767. Elsewhere, however, the Supreme Court did state that the trial judge "could have let prior misconduct in under ER 608(b) but chose not to." *Id.*

The State is correct in arguing that *Clark* treats both rules as potentially applying to a conviction—but no one made the argument in *Clark* that, fairly read and considering historical intent, the rules are mutually exclusive. Accordingly, the court's language implying that ER 608(b) could be a basis for cross-examining a witness about conduct underlying a conviction is dicta.

In this case, the ability to impeach Ms. Baird about her conviction for false statement with the limited information admissible under ER 609(a) would have satisfied the State's legitimate interest in pointing out this prior instance of dishonesty. By cross-examining Ms. Baird about the circumstances of the crime, the State was able to tar Mr. McBride as well: it succeeded in bringing to the jury's attention the fact that Mr. McBride also lied about his name to an officer.

Notwithstanding the dicta in *Clark*, we adopt the reasoning of the Ninth Circuit in *Osazuwa* and hold that a witness may not be questioned regarding facts leading to a prior conviction under ER 608(b), since doing so would constitute an end-run around ER 609(a)'s prohibition on presenting collateral evidence. ER 609's relative restrictiveness

15

can be explained as based on the fact that proof a witness has been convicted of a felony or a crime of dishonesty has an immediate, clear, and indisputable negative import. Cross-examination under ER 608(b), by contrast, amounts to an implicit accusation that a witness may deny or explain away. *See Osazuwa*, 564 F.3d at 1174 ("evidence of a prior conviction for dishonest acts can be far more prejudicial to a defendant than evidence of dishonest acts that have not been held to violate the law").

A trial court's discretionary decisions regarding the admissibility of prior convictions under ER 609 will only be reversed "where the record reflects a clear abuse of discretion." *State v. Anderson*, 31 Wn. App. 352, 354, 641 P.2d 728 (1982). In exercising its discretion whether to admit evidence, a trial court abuses its discretion if its decision is contrary to law. *State v. Neal*, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001). The trial court abused its discretion in overruling the defense objection.

The State argues that the trial court's error was harmless. We need not examine whether it was, since we find other reversible error as well as cumulative error, which we discuss hereafter.

Reversed and remanded.

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with RCW 2.06.040, the rules governing unpublished decisions.

We provide additional background relevant to the remaining issues.

16

When interviewed by Deputy Jordan, Mr. Himes confessed to a few other crimes, including the theft of the four-wheeler and the Kubota from Mr. Huber, and breaking into a second storage unit. He told police Mr. McBride did not participate in either of those crimes.

Based on the information provided by Mr. Himes, police contacted Mr. McBride at his house and asked him about the stolen items. Mr. McBride led them to his own shed, where he had a metal-frame camouflage backpack matching the description of one Mr. Himes had described as having been stolen from the Wagner storage unit. Mr. Wagner later identified it as his own. Mr. McBride told deputies that Mr. Himes had left the backpack in a car parked in his driveway. The officers also searched Mr. McBride's bedroom, where they found a green bag and a black duffel bag with clothing inside, both of which Mr. Wagner later identified as items stolen from his storage unit. The green bag had Mr. Wagner's name on it, although the name was blacked out with a marker.

According to Deputy Jordan, Mr. McBride initially denied having any knowledge of the stolen motorcycles or the Tekoa storage unit. However, when Deputy Jordan asked if he would find Mr. McBride's fingerprints on motorcycles the officers had recovered, Mr. McBride stated he had helped Mr. Himes work on a motorcycle. Similarly, Deputy Jordan testified that when he asked if he would see Mr. McBride on camera near the storage unit in Tekoa, Mr. McBride responded that he and Mr. Himes

17

had walked by the Wagner storage unit while going to retrieve a gas can from Mr. Himes's storage unit.

At trial, Mr. Himes testified that following the burglary of the Wagner storage unit, Mr. McBride decided to keep a few items including a green "[a]rmy style backpack" and "some stuff in a big duffel bag." RP at 97. He identified items later found at Mr. McBride's residence as ones stolen from Mr. Wagner's storage unit. Ms. Evans claimed at trial to recognize the metal-frame backpack found in Mr. McBride's shed as one of the items taken during the Wagner burglary, although she was not sure about other property found in Mr. McBride's possession.

Mr. Himes told the jury about Mr. McBride's alleged assistance with the theft of Mr. Petrovich's larger motorcycle and that he, Mr. Rower, and Mr. McBride then took the motorcycle to Lance Garrett's home.

In cross-examining Mr. Himes, Mr. McBride's lawyer obtained Mr. Himes's concession that he "probably" first told Deputy Jordan that he alone had committed the burglary of the Wagner shed. RP at 107. Mr. Himes testified that he "[didn't] remember exactly" if he had said anything about Mr. McBride being involved. *Id.* Mr. Himes conceded that after he was offered the plea deal, he gave a lengthy recorded statement in which he initially provided deputies with an incorrect date for the burglary of the Wagner storage unit, explaining that "I was pretty messed up." RP at 109-10. He admitted that in the lengthy recorded statement he lied about committing the Huber burglary by himself

18

and that, in fact, Ms. Evans had been involved; in fact, she had located that burglary target. He admitted he had committed the burglaries and sold the stolen property to buy methamphetamine, because it was "hard for [him] to get by without dope." RP at 119.

Ms. Baird testified for the defense that she had seen Mr. Himes hand the backpack and duffel bag later identified as property stolen from Mr. Wagner to Mr. McBride one December afternoon, when Mr. Himes and Ms. Evans were dropping him off after he had assisted Ms. Evans with some car trouble. According to her, Mr. Himes and Ms. Evans said they were going grocery shopping and asked if they could leave the bags with Mr. McBride. She also testified that Mr. Himes and Ms. Evans had access to the outer buildings at Mr. McBride's place, although she admitted that at the time of the December burglaries the shed was locked with a key, which was in Mr. McBride's possession. Finally, she testified that Mr. Himes and Mr. Garrett had brought a motorcycle to her home once, asking if Mr. McBride could help them get it started.

The State called Deputy Jordan and questioned him about his interviews of Mr. McBride and trial witnesses. The deputy testified that in his December interview of Ms. Baird in which she told him Mr. Himes and Mr. Rower were involved in the crimes, she also told him to "look at Bill McBride," because "he had been gone a lot lately at night." RP at 240. Deputy Jordan testified that Ms. Baird was upset with Mr. McBride at the time, telling the deputy that she suspected Mr. McBride of cheating on her. Ms. Baird

19

had unequivocally denied ever telling Deputy Jordan that Mr. McBride might have participated in the motorcycle theft.

At trial, Deputy Jordan testified that consistent with his plea agreement, Mr. Himes had provided information as to where various stolen items could be found, including at the homes of Trevor Shelton and Kim Fuchs. He explained that he was able to corroborate "[a]lmost everything" Mr. Himes told him by verifying that the stolen property he described was located at those residences. RP at 187. The prosecutor then asked Deputy Jordan whether he believed Mr. Himes had given him "real truthful information regarding the crimes that had happened and the people involved," to which the officer responded, "Yes, I did." *Id.*

During closing argument, the prosecutor made several statements relating to the truthfulness of various witnesses' testimony. Ms. Evans had not been a particularly helpful State witness, which he conceded; in her direct examination he had confronted Ms. Evans with being "a bit evasive today." RP at 146. In closing argument, he told the jury:

> [L]et's talk a little bit about Ms. Evans' testimony. Was it completely forthcoming? Absolutely not. I don't think anyone here would think so.

RP at 265. Later he added, "Ms. Evans is very reluctant to spill her guts and to tell the whole story." RP at 271.

20

But addressing other witnesses, he emphasized Mr. Himes's truthfulness. Those statements are challenged as misconduct and we address them in more detail below. He characterized Mr. McBride and Ms. Baird as untruthful, in argument that we also discuss hereafter. Mr. McBride's lawyer did not object to the prosecutor's statements about the witnesses' truthfulness.

### *Prosecutorial misconduct*

Mr. McBride contends that the prosecutor committed misconduct by eliciting Deputy Jordan's opinion as to the truthfulness of Mr. Himes and by commenting on the credibility of Mr. McBride and vouching for other witnesses during closing argument. To prevail on a claim of prosecutorial misconduct, a defendant must establish both the impropriety of the prosecutor's comments and their prejudicial effect. *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221 (2006).

Even if a prosecutor's comments are improper, the defense may waive a prosecutorial misconduct claim by failing to object to the remark and request a curative instruction. *State v. Hoffman*, 116 Wn.2d 51, 93, 804 P.2d 577 (1991). Because defense counsel never objected to any of the alleged instances of misconduct nor asked for a curative instruction, Mr. McBride must show that the conduct was "so flagrant or ill intentioned that it evinces an enduring and resulting prejudice" that could not have been cured by an instruction to the jury. *Id.*; *State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994) ("Reversal is not required if the error could have been obviated by a curative

21

instruction which the defense did not request."); *see also State v. Jones*, 117 Wn. App. 89, 90-91, 68 P.3d 1153 (2003) (quoting *State v. Suarez-Bravo*, 72 Wn. App. 359, 367, 864 P.2d 426 (1994)).

*Alleged instances of prosecutorial misconduct*

Mr. McBride first contends that the prosecutor committed misconduct by asking Deputy Jordan if he believed Mr. Himes had provided him with truthful information. Given the question and the answer, the deputy testified not only that he had been able to corroborate information provided by Mr. Himes but also that he believed Mr. Himes had given him "real truthful information" about the crimes and the people involved:

> [Prosecutor]: As far as the things that Mr. Himes told you, were you able to verify a lot of it?
> [Deputy Jordan]: Yes. Almost everything.
> [Prosecutor]: Almost everything. Okay.
>     *Did you believe [Himes] had given you – real truthful information regarding the crimes that had happened and the people involved?*
> [Deputy Jordan]: *Yes, I did.*
> [Prosecutor]: Okay.
> Who – Who did you learn was involved through your investigation?
> [Deputy Jordan]: I learned that Kenneth Himes, William McBride and Sheila Evans were involved.

RP at 187 (emphasis added).

The State "does not dispute that the prosecutor committed misconduct by eliciting the testimony from Deputy Jordan that Mr. Himes had provided 'real truthful information,'" conceding, "[t]his should not have been done." Br. of Resp't at 12. We accept the State's concession, which is well taken. "Improper opinion testimony violates

22

a defendant's [constitutional] right to a jury trial [by] invad[ing] the fact-finding province of the jury." *State v. Thach*, 126 Wn. App. 297, 312, 106 P.3d 782 (2005) (citing *State v. Dolan*, 118 Wn. App. 323, 329, 73 P.3d 1011 (2003)). "Testimony from a law enforcement officer regarding the veracity of another witness may be especially prejudicial because an officer's testimony often carries a special aura of reliability." *State v. Kirkman*, 159 Wn.2d 918, 928, 155 P.3d 125 (2007); *State v. Rafay*, 168 Wn. App. 734, 805-06, 285 P.3d 83 (2012).

Turning to closing argument, Mr. McBride first complains that the prosecutor vouched for the credibility of Ms. Baird's alleged statement to Deputy Jordan that he ought to "look at Bill McBride" in connection with the motorcycle thefts—a statement that Ms. Baird denied making. In arguing to the jury that Ms. Baird had in fact implicated Mr. McBride, the prosecutor argued that she had given the deputy Mr. McBride's name, and

> [S]he's angry at him and she's throwing his name out there because she knows he's involved. But is she a little reluctant? Sure. They've been dating for seven years and presumably are again at this point, and she knew that at the time. But she was upset with him *and she told them the truth.*

RP at 269 (emphasis added).

Mr. McBride next complains that, in addressing Deputy Jordan's and Ms. Baird's conflicting versions of Ms. Baird's interview, the prosecutor reminded the jury that the

23

deputy told them Ms. Baird's version was "not the truth." RP at 288. He relies on the following argument:

> And Amy Baird denied on the stand yesterday that she ever told Dep. Jordan that Bill McBride was involved. *But Dep. Jordan told you that's not the truth*; Amy Baird told him, "Yeah, and maybe Bill."

*Id.* (emphasis added).

Mr. McBride next argues that during closing argument, the prosecutor vouched twice for his most critical witness, Mr. Himes, and also told the jury that Mr. McBride, who had not testified at trial, had lied to police during the investigation.

The first example of vouching for Mr. Himes was argument in which the prosecutor pointed out that Mr. Himes had admitted to his involvement in the rash of burglaries "[a]nd *honestly implicates* Ms. Evans, and *Mr. McBride, and their parts in it as well.*" RP at 268 (emphasis added).

Later, the prosecutor responded to defense attacks on Mr. Himes's credibility by telling the jury in rebuttal:

> [Himes] *doesn't tell lies* that can't be corroborated. *He tells what actually happened* and the police are able to verify some of it.

RP at 294 (emphasis added). He then added:

> Mr. McBride *does lie* when confronted by Dep. Jordan.

*Id.* (emphasis added).

24

Finally, in what Mr. McBride suggests (and we agree) is the most problematic part of closing argument, the prosecutor told the jury:

> Is Ken Himes an honest man? No; he's a thief. But was he honest about what he did? Yes. Was he honest about those who helped him? Yes. . . .
>
> . . . .
> Is [Mr. Himes] telling the truth? Yeah. He's telling the truth about everything that happened.

RP at 295-96.

"It is misconduct for a prosecutor to state a personal belief as to the credibility of a witness." *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008). Because prosecutors have "wide latitude to argue reasonable inferences from the facts concerning witness credibility," *id.*, "[p]rejudicial error does not occur until such time as it is clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion." *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983), *overruled in part on other grounds by State v. Davis*, 101 Wn.2d 654, 658-59, 682 P.2d 883 (1984).

The State contends that in making each of these statements, the prosecutor was merely drawing inferences from the facts presented at trial. It emphasizes that the prosecutor never stated, "I believe" or "I think" or "I know" that certain witnesses were telling the truth or lying. For support, the State relies primarily on *Warren*, and *State v. Brett*, 126 Wn.2d 136, 892 P.2d 29 (1995). But those cases are distinguishable.

25

In *Warren*, the court held that the prosecutor did not commit misconduct by arguing during closing that the details in the witness's testimony gave it a "badge of truth" and the "ring of truth." *Warren*, 165 Wn.2d at 30. First, the court noted that defense counsel had "clearly attacked" the witness's credibility during opening statements and cross-examination, and that the prosecutor "responded by arguing that the level of detail in [her] testimony raises a reasonable inference that she was telling the truth." *Id.* The court noted that "there was no explicit statement of personal opinion." *Id.*

Similarly, the prosecutor in *Brett* did not commit misconduct by arguing that "one reason" the jury might want to believe one witness over the other was that at the time the events to which she testified were occurring, she "was watching her husband of 33 years being blown away by a .410 shotgun. And maybe that's the kind of scenario of events that she's going to remember fairly well for the rest of her life." *Brett*, 126 Wn.2d at 175. The court concluded that by offering a reason, the prosecutor was not making a statement of personal belief.

Unlike in *Warren* and *Brett*, the prosecutor in this case did not frame his arguments in terms of reasonable inferences the jury could draw from the facts. He did not argue that facts gave witnesses' testimony a "ring of truth" or provided "one reason" the jury might want to believe them. This case is more like *State v. Ramos*, 164 Wn. App. 327, 341 n.4, 263 P.3d 1268 (2011), in which the prosecutor improperly vouched

26

for the credibility of police witnesses by stating, "[T]he truth of the matter is [the police witnesses] were just telling you what they saw and they are not being anything less than 100 percent candid." (Alteration in original) (internal quotation marks omitted).

When a prosecutor tells the jury that "the defendant lied" and "our key State witness told you the truth," there is a clear implication that the prosecutor is expressing his or her personal belief. It is unnecessary to say, "I believe," or "I think," or "I know."

In determining whether prosecutorial misconduct was so flagrant and ill intentioned that waiver will not be found, we focus "less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). "Under this heightened standard, the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). The State's case against Mr. McBride turned almost entirely on the credibility of Mr. Himes: a methamphetamine user who had provided inconsistent information and who was testifying against Mr. McBride pursuant to a favorable plea bargain. When the statements in closing argument are considered in their entirety together with the eliciting of Deputy Jordan's opinion that Mr. Himes provided truthful information on Mr.

27

McBride's involvement in the crimes, we conclude that this is the rare case in which the heightened standard is met.

### *Ineffective assistance of counsel*

Mr. McBride also argues that he received ineffective assistance of counsel when his lawyer failed to object to Deputy Jordan's improper opinion testimony and the prosecutor's improper vouching for the credibility of the State's witnesses and comment that Mr. McBride lied. "A claim of ineffective assistance of counsel presents a mixed question of fact and law reviewed de novo." *State v. Sutherby*, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

To prevail on a claim of ineffective assistance of counsel, the defendant is required to show both (1) "that defense counsel's conduct was deficient, i.e., that it fell below an objective standard of reasonableness," and (2) "that the deficient performance resulted in prejudice, i.e., that there is a reasonable possibility that, but for the deficient conduct, the outcome of the proceeding would have differed." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

Given our conclusion that the prosecutor improperly elicited opinion testimony and vouched for the credibility of several witnesses, defense counsel was deficient in failing to object. And here again, because this was a case that depended upon the jury's assessment of the credibility of Mr. Himes versus that of Ms. Baird, there is a reasonable

28

No. 32318-8-III
*State v. McBride*

possibility that, but for the deficient conduct, the outcome of the proceeding would have differed.

### Cumulative error

Finally, "[t]he cumulative error doctrine applies when several trial errors occurred and none alone warrants reversal, but the combined errors effectively denied the defendant a fair trial." *State v. Jackson*, 150 Wn. App. 877, 889, 209 P.3d 553 (2009). "The defendant bears the burden of proving an accumulation of error of sufficient magnitude that retrial is necessary." *State v. Yarbrough*, 151 Wn. App. 66, 98, 210 P.3d 1029 (2009) (citing *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835 (1994)).

Had we not concluded that Mr. McBride has demonstrated reversible error as a result of prosecutorial misconduct and ineffective assistance of counsel, then, on the basis of the additional error in admitting collateral evidence of the crime committed by Ms. Baird, we would find cumulative error and reverse on that basis.

Reversed and remanded.

_____
Siddoway, C.J.

WE CONCUR:

_____
Fearing, J.

_____
Lawrence-Berrey, J.

29