IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of: | ) | No.  37774-1-III |
| | ) | |
| | ) | |
| CHRISTOPHER B. RAMIREZ, | ) | UNPUBLISHED OPINION |
| | ) | |
| Petitioner. | ) | |
| | ) | |

LAWRENCE-BERREY, A.C.J. — A Spokane County jury convicted Christopher

Ramirez of two counts of aggravated murder in the first degree and one count of unlawful

possession of a firearm in the first degree.  Due to a potential error in the charging

document, the trial court consented to the State's request to sentence Mr. Ramirez as if he

had been convicted of murder in the first degree without aggravating circumstances.

In his direct appeal, Mr. Ramirez raised 10 issues and several others in a statement

of additional grounds for review.  His primary issue concerned the admissibility of the

eyewitness identification, which caused the Innocence Project Inc. to file an amicus brief

in support of him.  This court affirmed.  The Washington Supreme Court and the United

States Supreme Court denied review.

Mr. Ramirez now brings this timely personal restraint petition (PRP) raising four

claims of ineffective assistance of counsel and one claim of deprivation of counsel. We

deny all pretrial and trial related claims, grant his sentencing-related claim, and remand

for resentencing.

FACTS

The statement of substantive facts, pretrial procedure, and trial are taken from this

court's opinion on direct appeal. *State v. Ramirez*, 5 Wn. App. 2d 118, 425 P.3d 534

(2018).

A.    SUBSTANTIVE FACTS

On November 1, 2014, at approximately 9:34 p.m., law enforcement received

reports of gunfire from Spokane Valley's Broadway Square Apartments. When officers

arrived at the scene, they connected the gunfire to apartment four of the complex, which

had been occupied by brothers Arturo and Juan Gallegos. Juan Gallegos's deceased body

was outside the apartment. He had sustained multiple gunshot wounds. Arturo Gallegos

was discovered inside a bedroom in apartment four with a single, fatal gunshot wound to

the head.

The evidence indicated Arturo Gallegos had been shot while sitting inside his

room, on top of his bed. There did not appear to have been a precipitating struggle or any

sort of theft or ransacking of his room or apartment. Gunpowder stippling left on Arturo Gallegos's face indicated he had been shot at close range. A bloodstained hat and glove were located on the bed.

A further review of the scene suggested Juan Gallegos was shot and killed after Arturo Gallegos. Although Arturo Gallegos had been shot only once, his bedroom contained three shell casings. The door from Arturo Gallegos's bedroom into the apartment hallway was marked with two bullet holes. Door fibers surrounding the holes indicated the bullets had traveled from inside the bedroom into the hallway. No bullet fragments or markings were found in the hallway. Instead, the hallway wall was smeared with blood, which was later identified as belonging to Juan Gallegos. On the floor of the hallway were a pair of flip flops that had been discarded in an irregular fashion. Next to the flip flops was another blood stain from Juan Gallegos. Juan Gallegos's body was found outside the main door, in front of apartment three. He was barefoot and had suffered 11 gunshot wounds.

Officers theorized that Juan Gallegos was initially shot while attempting to open the door to his brother's bedroom after hearing the gunshot that killed Arturo Gallegos. Once Juan Gallegos was shot through the door, he tried to escape down the apartment

3

hallway, losing his flip flops along the way. Juan Gallegos was able to escape from the apartment, only to be shot and killed outside.

As part of the investigation, officers talked to residents of the Broadway Square Apartments. No one saw the shooting or an apparent assailant. However, one of the residents reported hearing something near the fence behind the apartment complex around the time of the shootings. A K-9 handler investigated the area and picked up a track that went south from the complex for about two blocks to an address on East Valleyway Avenue in Spokane Valley.

Once at the East Valleyway address, officers were approached by a man named Carlton Hritsco. Mr. Hritsco asked if the officers were looking for a "'Mexican guy.'" 3 Report of Proceedings (RP) (Oct. 6, 2016) at 476. Mr. Hritsco explained that he had been outside his house and smoking a cigarette when he heard someone approach. The individual told Mr. Hritsco his name was "Demon." *Id*. at 514. The individual made Mr. Hritsco nervous, so Mr. Hritsco texted a friend, asking the friend to come over. The text went through at 9:41 p.m. Mr. Hritsco told law enforcement he felt certain he would be able to recognize the individual who had identified himself as Demon. A sheriff's deputy showed Mr. Hritsco photographs of five individuals from the Spokane area who were known to use the moniker "Demon." The photographs were pulled up, one by one, on the

4

computer screen inside the deputy's vehicle. Although one of the five photographs depicted Christopher Ramirez, Mr. Hritsco was not able to make a positive identification. Mr. Hritsco did say that Demon had been using his cell phone during their interaction. He also added that Demon was looking for a ride and had asked for directions to the bus.

The morning after the murders, law enforcement contacted Arturo Gallegos's daughter, Rosemary Valerio, and her husband, Angel Valerio. Mr. Valerio identified Mr. Ramirez as someone who had problems with Arturo and Juan Gallegos. Mr. Ramirez is Rosemary Valerio's cousin and the nephew of Arturo and Juan Gallegos. Mr. Valerio disclosed that on July 15, 2014, Mr. Ramirez had sent a text message to his uncles, Arturo and Juan, along with several others, that read, "'Tio. We all die. Rest in peace. Fuck you all if that's how it is.'" 2 RP (Oct. 6, 2016) at 376. Mr. Ramirez had also previously acknowledged pulling out a knife on Arturo Gallegos. Mr. Valerio disclosed that Mr. Ramirez went by the nickname "Demon."

Mr. Ramirez was arrested on November 2, 2014. Officers obtained a sample of Mr. Ramirez's deoxyribonucleic acid (DNA) and it was discovered Mr. Ramirez was the major contributor to DNA found on the interior portions of the bloodstained hat and glove found on Arturo Gallegos's bed. The blood was determined to have come from Arturo Gallegos. A search of Arturo Gallegos's cell phone revealed Mr. Ramirez had made

5

plans to meet up with Arturo Gallegos on the evening of the murders. Telephone records also indicated Mr. Ramirez had placed a call at 9:59 p.m. on November 1 to the Spokane Transit Authority's bus schedule hotline.

After Mr. Ramirez's arrest, a sheriff's detective used Mr. Ramirez's booking photo to prepare a new photomontage to present to Mr. Hritsco. The montage contained six photos. Each photo was shown to Mr. Hritsco, one at a time. Mr. Hritsco again was unable to make an identification.

No firearm was ever recovered in connection with the murders of Arturo and Juan Gallegos.

B.     PRETRIAL PROCEDURE

The State charged Mr. Ramirez with two counts of premeditated first degree murder for the deaths of Arturo and Juan Gallegos and one count of unlawful possession of a firearm. Trial was delayed for several months to allow for competency evaluations. After Mr. Ramirez was deemed competent, trial was scheduled to start on October 3, 2016.

Approximately two weeks before trial, Mr. Ramirez's attorneys filed a motion to exclude Mr. Hritsco's testimony about the conversation he had with Demon. In the motion, defense counsel raised multiple arguments: (1) the State lacked sufficient

6

evidence to connect Mr. Ramirez with the man who spoke to Mr. Hritsco and, given the

lack of connection, Demon's statements were not statements of a party opponent but were

inadmissible hearsay; (2) Mr. Hritsco's testimony about Demon's statements would be

irrelevant (in violation of ER 401) and more prejudicial than probative (in violation of

ER 403); and (3) the introduction of statements of an unknown and out-of-court witness

would violate Mr. Ramirez's constitutional right to confront his accuser.

Defense counsel also filed a motion to exclude a report and testimony from Federal

Bureau of Investigation (FBI) Special Agent Jennifer Banks. The State had proffered

Special Agent Banks as an expert witness on historical cell site analysis. According to

the report prepared by Special Agent Banks, records obtained from Mr. Ramirez's cell

phone provider placed him near the Broadway Square Apartments 10 minutes before the

first 911 call was placed on November 1, 2014. In the motion, defense counsel argued

that Special Agent Banks's testimony should be struck based on late disclosure and

because it failed to meet both the *Frye*[1] standard for admissibility and the criteria for

expert testimony under ER 702.

Three days before trial, the State informed Mr. Ramirez's attorneys that it had

received additional information from Mr. Hritsco. During an interview on September 30,

---

[1] *Frye v. United States*, 54 App. D.C. 46, 293 F. 1013 (1923).

2016, Mr. Hritsco disclosed that he had seen photos of Mr. Ramirez in the media. Based on those photos, Mr. Hritsco said he was absolutely sure Mr. Ramirez was the individual he had talked to the night of the murders. Mr. Hritsco claimed the hair in the photos shown to him by law enforcement had prevented him from previously making a positive identification.

The parties argued the pending pretrial motions on the morning set for trial. Defense counsel continued to claim Mr. Hritsco's testimony should be excluded because the individual named Demon who talked to Mr. Hritsco was an unknown hearsay declarant. Apparently recognizing that the recent information obtained from Mr. Hritsco undercut this argument, counsel argued that the most recent statement should "not be considered for purposes" of the pretrial motions hearing because the statement "wasn't submitted timely." 1 RP (Oct. 3, 2016) at 57. No constitutional concerns were raised about Mr. Hritsco's testimony. Nor did the defense question Mr. Hritsco's reliability. However, defense counsel noted that if Mr. Hritsco's most recent information had been disclosed at an earlier date, they would have "looked into an expert witness who could have testified about cross-racial identification as well as generally the ability of people to recall things better or worse over time." *Id*. at 65. Although the State indicated it would not object to a continuance, Mr. Ramirez's attorneys specifically refused to ask for more

time. After taking the matter under advisement, the trial court ruled that Mr. Hritsco's testimony was admissible.

Prior to jury selection, the trial court held a *Frye* hearing to determine the admissibility of Special Agent Banks's testimony. Special Agent Banks testified that she is part of the FBI's Cellular Analysis Survey Team (CAST). CAST members receive training in engineering and in deciphering cell phone records. Special Agent Banks described two components to her work. First, she interprets historical call detail records from cellular telephone providers in order to discern the location of cell towers activated by a particular voice call or text message. Second, she performs field tests of geographic areas to determine the strength of various cell towers. The field test involves driving through a location with a scanning device. The FBI's scanning device uploads cellular frequencies in a given area to a computer program, which plots signal strengths on an area map. Special Agent Banks testified that CAST agents had testified in approximately 400 courts throughout the country and that the CAST methodology is more widely accepted in the law enforcement community than any other cellular location method.

Defense counsel argued that Special Agent Banks's testimony should be struck because her expert report was untimely and because the FBI's mapping software had not been validated. The State made clear that it would not object to a continuance if Mr.

9

Ramirez wanted more time to evaluate Special Agent Banks's report. However, Mr.

Ramirez insisted on moving forward with trial as scheduled. The trial court ultimately

permitted the State to go forward with Special Agent Banks's testimony, finding that the

substance of the testimony was not novel.

C.    TRIAL

The State's trial evidence was consistent with the above substantive facts. During

cross-examination of the State's witnesses, defense counsel procured testimony that the

Broadway Square Apartments was a hub for illegal activity. Over the State's objections,

defense counsel also procured testimony that drug paraphernalia was found in the

Gallegoses' apartment and that both brothers had methamphetamine in their system at the

time of their deaths.

Mr. Hritsco testified at trial and identified Mr. Ramirez as the man who identified

himself as "Demon" the night of the murders. No objection was made to Mr. Hritsco's

in-court identification. The defense's examination of Mr. Hritsco was brief. Mr. Hritsco

was not asked about his media exposure, the pretrial identification procedures used by

law enforcement, or the reliability of his in-court identification.

Defense counsel did cross-examine law enforcement about their pretrial efforts to

have Mr. Hritsco identify Mr. Ramirez. But counsel did not question whether the

identification procedures used comported with standard policies or whether those procedures raised eyewitness reliability concerns.

During her testimony, Special Agent Banks explained how her CAST analysis applied to Mr. Ramirez's case. According to her, Mr. Ramirez's call detail records included not only a code for each cell site antenna activated by his phone calls and texts, but also the 120-degree angle that the antenna had been pointed at the time of connection. By plotting the call detail data onto a map, Special Agent Banks determined that Mr. Ramirez's cell phone was in the area of the Broadway Square Apartments at 9:24 p.m. on November 1, 2014. This was approximately 10 minutes before the first 911 calls. The call records also indicated the phone had moved south of the Broadway Square Apartments by the time of Demon's interaction with Mr. Hritsco.

In addition to interpreting the call detail records, Special Agent Banks explained the field test she performed in connection to Mr. Ramirez's case. To perform the test, she drove through Spokane Valley, collecting cell tower frequencies with an FBI scanner. The FBI's scanning software was then able to generate a map, showing the coverage strength area for each of the cell towers activated by Mr. Ramirez's cell phone. The maps developed from the drive-through process largely corroborated the information from the maps developed solely from the call detail records.

11

The defense called one witness during its case in chief. The witness was a resident of the Broadway Square Apartments. The witness stated he knew an individual named Maceo Williams, but he did not know Mr. Ramirez. Mr. Williams was one of the five individuals with the alias "Demon" whose photographs had been shown to Mr. Hritsco on the night of the murders.

The jury found Mr. Ramirez guilty as charged. At sentencing, the State argued the sentences for the two murders with firearm enhancements were required to run consecutively under the serious violent offense provision of RCW 9.94A.589(1)(b). The trial court agreed it was required to impose consecutive sentences and sentenced Mr. Ramirez to 608 months for count 1 and 380 months for count 2, for a total of 988 months, with the unlawful possession of a firearm count running concurrently to the first two counts.

D.   ADDITIONAL PRP FACTS

The following documents were not part of the record on direct appeal. They are from Mr. Ramirez's five appendixes to his PRP, other miscellaneous documents filed by Mr. Ramirez, and attachments to the State's response brief. To help contextualize the relevance of these documents, this section will start with a summary of Mr. Ramirez's arguments and a summary of some of the evidence in support of those arguments:

Issue 1.        Counsel was ineffective for failing to move to suppress Mr. Hritsco's identification of Mr. Ramirez. Issue 1 re-raises the issue rejected in the direct appeal concerning the unreliability of Mr. Hritsco's identification of Mr. Ramirez as Demon and counsel's failure to move for suppression on the grounds of unreliability.

Issue 2.        Counsel was ineffective for failing to impeach Mr. Hritsco through his prior convictions. Mr. Hritsco had one prior misdemeanor conviction and two prior felony convictions. Furthermore, Mr. Hritsco's felony convictions were the result of an agreement to testify against his prior codefendants. Mr. Ramirez believes defense counsel, during cross-examination of Mr. Hritsco, should have questioned Mr. Hritsco about his prior convictions and his previous agreement to cooperate with the State.

Issue 3.        Counsel was ineffective for failing to object to the aggravating circumstances jury instructions because the aggravating circumstances were not properly pleaded in either the information or the amended information.

But at sentencing, the State conceded it might not have properly charged Mr. Ramirez with aggravating circumstances. Because of this possible error, it asked the court to sentence Mr. Ramirez as if he had only been convicted of murder in the first degree, even though the jury had found him guilty of murder in the first degree with aggravating circumstances. With aggravating circumstances, the only possible sentence is

13

life without parole; without aggravating circumstances, the defendant faces a lengthy standard range sentence.

Issue 4.        Counsel was ineffective for not advising Mr. Ramirez that he was charged with aggravated murder in the first degree instead of nonaggravated murder in the first degree.  Had Mr. Ramirez known that a mandatory life sentence was a possibility, he asserts he would have engaged in plea negotiations.

In rebuttal, defense counsel insists he advised Mr. Ramirez that he was charged with aggravated murder in the first degree.  And despite this, Mr. Ramirez refused to engage in any plea negotiations.

Issue 5.        Mr. Ramirez was completely deprived of counsel at sentencing. After the State asked for a high-end standard range sentence, defense counsel failed to make any request for a lesser sentence.  The court imposed the State's recommended sentence.

### Mr. Ramirez's Declaration

Mr. Ramirez's declaration is relevant to Issues 4 and 5: failure to advise and deprivation of counsel at sentencing.  Concerning misadvisement of the risks he faced by going to trial, Mr. Ramirez declares:

- My attorney did not tell me that Spokane had charged me with aggravated murder. My attorney also did not tell me that, if convicted, I faced a life without parole sentence. My attorney also did not tell me that the State could ask for the death penalty based on the aggravated murder charges.

- If I had known life without parole or even death were possible punishments, I would have more seriously considered negotiating a guilty plea to avoid the risk of trial. Even though I continue to declare my innocence, I would have told my attorney I wanted to consider a plea deal. I would have pushed him to negotiate a deal with the prosecutors. I would have considered any deal he brought to me and weighed it against the risk of life without parole or death. Because of the length and definiteness of the possible sentence, I would have done so even though I know I am innocent.

*See* Aff. of Christopher Ramirez, *State v. Ramirez*, No. 37774-1-III (Wash. Ct. App.

Oct. 2, 2020).

The second issue that the declaration addresses is counsel's failure to ask for a

lesser sentence. Mr. Ramirez declares:

- My attorney really did not talk to me about sentencing at all, even after the jury found me guilty. He did not ask me about evidence of my character. He did not ask me about people who could vouch for my character. He did not ask me about my family circumstances, my upbringing, my health, my education, etc.

*See id.*

Defense Counsel's Declaration

One of Mr. Ramirez's trial attorneys, Derek Reid, filed a declaration addressing

Issues 1 and 4: failure to seek suppression of the eyewitness identification and failure to

advise of the consequences of conviction.

15

Regarding Issue 1, trial counsel declared:

- On the Friday before pretrial proceedings, I learned the prosecutor and a detective had visited Mr. Hritsco, who claimed to now be able to identify Mr. Ramirez as the "Demon" he spoke with on the night of the murders. As this was just before trial, I thought about what to do with this potential new evidence over the weekend, and [co-counsel] Ms. Foley and I discussed how the evidence would impact our overall theory of the case. If admitted, we obviously wanted the fact that two of three possible identifications were not of Mr. Ramirez. On balance, I surmised that the jury would see through the obvious attempt by the State to buttress the flaws in its case at the last possible minute.

- We did not receive the report until shortly before the trial. When we did, I filed a motion to exclude the new evidence as a discovery violation under Criminal Rule 4.7.
- I did not argue the new identification should be excluded also as unreliable under constitutional due process analysis or ER 403, although this may have been an independent legal theory to support exclusion of the evidence. On the quick time I had to analyze how to approach this new identification evidence, I decided to pursue exclusion under the discovery rules.

- I also decided it would not be all that beneficial to the state or harmful to Mr. Ramirez if the court did not exclude the identification because it came so late in the game. I thought the timing would discredit the identification evidence.

*See* Aff. of Trial Counsel Derek Reid, *State v. Ramirez*, No. 37774-1-III (Wash. Ct. App.

Oct. 2, 2020).

The declaration demonstrates that counsel did move to suppress the evidence, but

on other grounds than were argued on appeal and argued again now (i.e. that the

eyewitness identification was so unreliable as to require exclusion). Given the time

constraints faced by counsel after the first motion to suppress was denied, a decision was

16

made by defense counsel to use the questionable identification to attack Mr. Hritsco's credibility.

The second issue addressed by Mr. Reid rebuts Mr. Ramirez's declaration concerning misadvisement:

- I discussed the death penalty with the prosecutor assigned, the supervisor of major crimes, and the elected prosecutor. The prosecution assured me it was not and would not be seeking the death penalty.

- In addition to telling Mr. Ramirez that the death penalty was not being considered, I advised him of the potential consequences, including the possibility that LWOP [life without the possibility of parole] could be a result, either in relation to RCW 10.95 or a constructive life sentence based on the nature of the offenses, and if convicted the consecutive sentences would effectively result in a life sentence.

- I fully advised Mr. Ramirez as to all of the possibilities regarding sentencing. But once his concern about the death penalty was allayed, Mr. Ramirez was aware of the sentencing options and did not want to discuss them any further, especially if it meant he would have to plead guilty to anything. Mr. Ramirez strongly maintained his innocence throughout my representation of him.

- Although I had some preliminary discussions with the prosecution about a plea deal, we never got close to any kind of agreement. As in any case I attempt to see if there is a potential resolution available to my client. I recall floating a plea deal to 20 to 25 years, but the State immediately rejected it. Mr. Ramirez was very clear that he would not take any deal the State would offer because of his strong defense of his innocence.

*See id.*

17

Appendix 1

Appendix 1 contains this court's prior opinion, the mandate from the direct appeal, the United States Supreme Court's order denying certiorari and the judgment and sentence. These documents are relevant to establishing the timeliness of the PRP, which the State agrees is timely.

The appendix also contains three newspaper articles (*Spokesman Review* and *Seattle Times*) reporting on Mr. Hritsco's 2007 case where he struck a plea deal to testify against a codefendant. This evidence relates to Issue 2: failure to cross-examine Mr. Hritsco concerning his prior offenses.

The last few items in the appendix are a few trial exhibits and the superior court docket from Mr. Ramirez's case. One exhibit shows Mr. Ramirez from the nose up standing in front of height measurements, showing him to be approximately 5'10". The other exhibits are pictures of the text message from the night of the murder where Mr. Hritsco texted a friend to come over and bring a "side arm. Strange man at my house." Pet'r's App. to PRP at 76. These documents have no bearing on any of the issues raised by Mr. Ramirez. The picture of Mr. Ramirez is potentially relevant to the eyewitness identification issue.

Appendix 2

Appendix 2 primarily contains documents from Mr. Hritsco's 2007 case: the charging document, the probable cause affidavit, the amended information, the plea form, the judgment and sentence, and the satisfaction of judgment. These documents are all relevant to Issue 2: failure to cross-examine Mr. Hritsco about his prior convictions.

In 2007, the State charged Mr. Hritsco as an accomplice with aggravated murder in the first degree for the 2005 killing of Sebastian Esquibel and kidnapping in the first degree of Sebastian Esquibel, along with conspiracy to commit the same. In exchange for agreeing to cooperate with the State, Mr. Hritsco received reduced charges of assault in the second degree and kidnapping in the second degree, and a 15-month concurrent sentence. The record before this court is not clear what Mr. Hritsco's involvement was in the 2005 murder, but it appears to have been relatively minor in comparison to his codefendants.

On November 27, 2017, a satisfaction of judgment was entered showing the Spokane County Clerk's Office zeroed out Mr. Hritsco's outstanding restitution interest. This satisfaction was entered nine years after the judgment and sentence was entered and a little more than one year after Mr. Hritsco testified at Mr. Ramirez's trial. In Issue 2, Mr. Ramirez speculates that the outstanding LFOs (legal financial obligations) gave Mr.

19

Hritsco an incentive to cooperate with the State in Mr. Ramirez's prosecution so as to reduce those LFOs and that trial counsel should have cross-examined Mr. Hritsco about this.

The final attachment is an e-mail from the deputy prosecutor from Mr. Ramirez's case to Mr. Ramirez's trial counsel listing the convictions for each of the State's witnesses in Mr. Ramirez's case. The e-mail states that Mr. Hritsco had convictions in 2008 for assault in the second degree, kidnapping in the second degree, and unlawful possession of a controlled substance; a conviction in 2003 for reckless endangerment; and a conviction from 2002 for theft in the third degree. The e-mail contains another notation for an additional third degree theft conviction that the prosecutor believed might be duplicative of the 2002 theft conviction.

Appendix 3: First Motion to Supplement Record

Mr. Ramirez filed his third appendix and his first motion to supplement the record on November 20, 2020. This was approximately one month after the court called for a response from the prosecutor, but before the State had filed its response to the PRP.

There are two documents in appendix 3. The first document is a seven-page report from expert psychologist Dr. Geoffrey Loftus, along with his curriculum vitae (CV). This

submission is directed at Issue 1: failure to suppress the eyewitness identification.  The

second document is the docket from Mr. Hritsco's 2002 misdemeanor theft.

Dr. Loftus is an expert in "human perception and memory" and has testified on the

subject in "approximately 475" court cases, including 164 in Washington State.  Pet'r's

App. 3, at 124.  He has no opinion on whether Mr. Hritsco actually saw Mr. Ramirez on

the night of the crime, but only that the circumstances of Mr. Hritsco's identification were

too flawed to be considered reliable.  Summarized, Dr. Loftus's opinions are:

- Data shows that a witness's level of confidence is not a reliable indicator of the accuracy of the witness's memory "when (a) the original memory is poor, and (b) there is an apparent source of potentially false and biased post-event information,"[2] both of which are present in this case.

- Suggestive post-event information has been shown to bias witnesses to reconstruct new memories.

- This suggestive information can lead to new, strong, confidence-inducing memories that are not necessarily accurate.

- When Mr. Hritsco positively identified Mr. Ramirez, it was approximately two years later, which is unlikely to be reliable considering that "information learned under optimal circumstances decays away after about a year."[3]

- Mr. Hritsco's memory decay was likely greatly exacerbated by the fact that he viewed Demon under poorly lit conditions, which research has shown leads to even faster memory decay.

---

[2] Pet'r's App. 3, at 128.

[3] *Id.* at 127.

21

- Mr. Hritsco's claim shortly after the murders that he could recognize Demon, in conjunction with his failure to identify Mr. Ramirez from these two procedures, strongly suggests his memory of Demon's appearance mismatched Mr. Ramirez's appearance in the montages.

- Mr. Hritsco's subsequent identification of Mr. Ramirez from the television news could have simply been Mr. Hritsco remembering Mr. Ramirez from the two photomontages.

- The circumstances under which Mr. Hritsco finally identified Mr. Ramirez were highly suggestive and could have been the result of irrelevant factors that cannot be controlled for (e.g. witness motivation, any underlining "yes"/"no" bias, pressure felt by the witness).

*See id.* at 124-29.

On December 31, 2020, the State filed a motion to strike Dr. Loftus's report. The State argued that evidence in support of a PRP is subject to the one-year time bar and that letting the petitioner file supporting materials without a time limit is contrary to the doctrine of finality.

Mr. Ramirez responded that the State's motion was untimely. An answer to a motion must be filed within 10 days; the State filed its motion 30 days after the 10-day deadline. RAP 17.4(e). Mr. Ramirez also responded that the time bar only applies to new claims, not new evidence. *See In re Pers. Restraint of Bonds*, 165 Wn.2d 135, 140, 196 P.3d 672 (2008).

Attachments to State's Response

The State's response to the petition contains three attachments. The first attachment is the mandate from the direct appeal.

The second attachment is a declaration from a paralegal in the prosecutor's office explaining that a search of the judicial information system revealed that Mr. Hritsco has only one prior misdemeanor theft conviction, not two as Mr. Ramirez's counsel initially thought. The confusion stems from the fact that the misdemeanor conviction was a reduction from a felony forgery charge that took three years to resolve.

The third attachment is a declaration from Steven Garvin, one of the trial deputy prosecutors from Mr. Ramirez's case. The declaration is relevant to Issues 3 and 4: failure to object to aggravating circumstances instructions and failure to advise about the consequences of conviction.

Regarding Issue 3, Mr. Garvin declares: "After verdict and before sentencing, it was realized that the charging language for the aggravating circumstance . . . was potentially incomplete. A decision was made to ask for standard range sentences rather than life in prison without possibility of parole." Resp. to PRP, *In re Pers. Restraint of Ramirez*, No. 37774-1-III, Attach. C. The aggravating circumstance that the jury found was RCW 10.95.020(10): "There was more than one victim and the murders were part of

a common scheme or plan or the result of a single act of the person." The information and amended information lacked the clause: "there was more than one victim."

Regarding Issue 4, Mr. Garvin declares that the State never made any plea offers to Mr. Ramirez or his lawyer, pursuant to then-existing office policy. Mr. Garvin also declares that he searched the office's e-mail archive system, located 699 e-mails relating to the case, and that "[n]one pertained to settlement discussions or negotiation in any way. Any verbal offers made by Mr. Ramirez, through his counsel, were insufficient for acceptance and were rejected." Resp. to PRP, Attach. C. The purpose of this declaration is to rebut Mr. Ramirez's claim that he was prejudiced by counsel's alleged failure to advise because it dissuaded him from engaging in plea negotiations.

Appendix 4: Second Motion to Supplement Record

On February 1, 2021, Mr. Ramirez's counsel filed a reply brief, a motion to permit Mr. Ramirez to file an amended declaration, and a fourth appendix.

The amended declaration contains a sentence that counsel says was omitted by mistake from the original declaration. That sentence pertains to Mr. Ramirez's employment history (relevant to his sentencing argument). In all other respects, the amended declaration is the same as the declaration filed with the petition.

The proposed fourth appendix contains four sets of e-mails. The first two are relevant to Issue 2: failure to cross-examine Mr. Hritsco about his prior convictions. The second two are relevant to Issue 4: failure to advise.

The first set are e-mails between the prosecutor from Mr. Hritsco's 2007 case and Mr. Hritsco's lawyer concerning Mr. Hritsco's cooperation agreement. Attached to those e-mails is the plea agreement where Mr. Hritsco agreed to "testify truthfully . . . about any participants . . . in the crimes charged." 4 App. to PRP at 150. The plea agreement at appendix 149-51 is an unexecuted draft. The second set of e-mails is an e-mail from the Spokane County District Court informing PRP counsel that the only document still in existence from Mr. Hritsco's 2002 theft conviction is the docket.

The third and fourth sets of e-mails are from the deputy prosecuting attorneys who prosecuted Mr. Ramirez's case. Mr. Ramirez's trial lawyer, Derek Reid, asked the prosecutors if a plea was an option. One prosecutor responded that they would be willing to review any offer made by Mr. Ramirez. The other prosecutor responded that he had "some ideas that might be workable on my end." 4 App. to PRP at 160. The e-mails were exchanged in April 2016 (six months prior to trial) and do not contain any actual plea offers from either side. The e-mails between Mr. Ramirez's prosecutors and his trial counsel were offered now to rebut the State's declaration attached to its response stating

25

that the State was not interested in a plea. While the State might not have ended up making any offers, the e-mails show that the State was at least interested in reviewing any offers that Mr. Ramirez might make.

The State filed a timely objection to the motion to supplement the record, again arguing that the supplemental evidence was untimely. Mr. Ramirez replied that the State's argument was inconsistent because it objected to only Mr. Hritsco's plea documents and reasserted his argument that evidence can be supplemented throughout a PRP proceeding.

<u>Appendix 5: Third Motion to Supplement Record</u>

On May 5, 2021, Mr. Ramirez's counsel filed a supplemental brief, a fifth appendix, a declaration from Mr. Ramirez's defense investigator, and a motion to admit the new appendix and declaration.

The appendix contains two reports from the trial court pertaining to Mr. Ramirez's competency to stand trial, the Washington Association of Sheriffs and Police Chiefs (WASPC) "Model Policy" on eyewitness identification and the Spokane County Sheriff's Office Policy Manual on eyewitness identification. There is also a declaration from a defense investigator that is not part of appendix 5, but was submitted at the same time.

26

The competency reports are relevant to establish prejudice for Issue 5: deprivation of counsel at sentencing. The model policies are directed at Issue 1: failure to move to suppress the eyewitness identification. The declaration from the investigator is also directed at Issue 1.

The investigator was hired by PRP counsel after Mr. Ramirez's petition had already been filed. The investigator reached out to and conducted interviews with the two lead detectives from the case regarding Mr. Hritsco's two initial failures to identify Mr. Ramirez. The investigator's work took place between December 2020 and January 2021—after the State had filed its response but before Mr. Ramirez filed his reply. Mr. Ramirez does not explain why he did not seek to include this information when he filed his reply brief and fourth appendix or why he did not attempt to create this new evidence prior to filing his petition.

The declaration states that the interviews were audio recorded, but instead of transcribing the interviews or providing this court with the audio, the investigator drafted declarations for both detectives (presumably based on those interviews). The investigator sent the declarations to the detectives in April 2021, but they refused to sign. Attached to the investigator's declaration are the unsigned declarations sent to the detectives for their signature.

The State timely objected, essentially raising the same arguments it made in its previous two objections.

RESOLUTION OF PENDING MOTIONS TO SUPPLEMENT

Amendments to petitions must comply with the time bar. RAP 16.8(e). Washington's appellate courts generally permit petitioners to amend their petitions to raise new issues at any point within the time bar. *See, e.g.*, *In re Pers. Restraint of Meredith*, 191 Wn.2d 300, 307, 422 P.3d 458 (2018); *In re Pers. Restraint of Rhem*, 188 Wn.2d 321, 327, 394 P.3d 367 (2017); *In re Pers. Restraint of Davis*, 151 Wn. App. 331, 335 n.6, 211 P.3d 1055 (2009). But, the evidence attached in support of a petition is not the petition and thus not expressly governed by RAP 16.8(e). Unlike amendments to petitions, no case has ever expressly set forth any standards for supplementation of the record in PRPs.

In *In re Personal Restraint of Gentry*, 137 Wn.2d 378, 394-95, 972 P.2d 1250 (1999), one of the few PRPs to discuss supplementing a PRP record, the Supreme Court denied supplementation after finding the evidence would not change the outcome of the case. In *In re Personal Restraint of Williams*, 198 Wn.2d 342, 351 n.1, 496 P.3d 289 (2021), the Supreme Court denied a motion to supplement after finding that the proposed evidence was irrelevant. Neither case announced any standards for supplementing the

record or cited any authorities for supplementation. Instead, it appears the Supreme Court

made discretionary decisions based on the perceived import of the additional evidence.

The State argues that RAP 16.8(e)[4] and its reference to the time bar should

implicitly apply to evidence submissions under RAP 16.7(a)(2). We disagree.

RAP 16.7(a)(2) requires the petition to set forth the evidence the petitioner relies

on. The petitioner need not necessarily have that evidence in their possession at that time,

*see* RAP 16.7(a)(3),[5] but the evidence needs to at least be identifiable at the time the

petition is filed. RAP 16.7(a)(2). While the State's reading of RAP 16.7 is substantially

accurate, its conclusion about RAP 16.8 does not follow. RAP 16.8(e) explicitly applies

only to petitions and the grounds raised therein. The rule is silent on the timing of

amendments relating to supporting evidence, and this court will not read words into a

court rule that are not there. *State v. Cooper*, 156 Wn.2d 475, 480, 128 P.3d 1234 (2006).

---

[4] "The appellate court may allow a petition to be amended. All amendments raising new grounds are subject to the time limitation provided in RCW 10.73.090 and 10.73.100."

[5] RAP 16.7(a)(3) creates a procedure for obtaining necessary court documents not presently in the petitioner's possession. The rule applies only to court files and not other evidence the petitioner seeks to obtain outside of existing court records.

Mr. Ramirez points to RAPs 16.11(b) and 16.12 in support of his argument that a party may supplement the evidence in a PRP at any time. We also disagree with Mr. Ramirez's argument.

RAP 16.11 allows for remand to superior court to take additional evidence after the State has already filed its response. RAP 16.12, which governs the procedure at reference hearings, requires the court to grant the parties "reasonable pretrial discovery." Reference hearings and their attendant right to reasonable discovery are not the norm for PRPs. "[A] hearing is appropriate where the petitioner makes the required prima facie showing 'but the merits of the contentions cannot be determined solely on the record.'" *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18, 296 P.3d 872 (2013) (quoting *In re Pers. Restraint of Hews*, 99 Wn.2d 80, 88, 660 P.2d 263 (1983)). "[T]he purpose of a reference hearing is to resolve genuine factual disputes, not to determine whether the petitioner actually has evidence to support his allegations." *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992). "[I]f the 'evidence is based on knowledge in the possession of others,' the petitioner may either 'present their affidavits' or present evidence to corroborate what the petitioner believes they will reveal if subpoenaed." *Yates*, 177 Wn.2d at 18 (quoting *Rice*, 118 Wn.2d at 886). If the petitioner's allegations rest on information outside the record, "the petitioner must demonstrate that he has

competent, admissible evidence to establish the facts that entitle him to relief." *Rice*, 118 Wn.2d at 886.

Under *Rice* and *Yates*, the purpose of a reference hearing is to resolve material factual disputes (i.e., when declarations provide conflicting testimony), to test the weight and credibility of new affiants when those affiants' declarations establish a prima facie entitlement to relief, and to obtain material evidence that the petitioner cannot obtain any other way. The fact that petitioners have to meet a threshold burden before being entitled to a reference hearing and the fact that reference hearings serve a limited purpose actually supports, rather than negates, the premise that this court can and should place reasonable limits on supplementing the record.

When no rule governs a procedural matter, Washington's courts are directed to RCW 2.28.150. RCW 2.28.150 authorizes this court to adopt whatever procedures it deems "most conformable to the spirit of the laws" when no statute or court rule explicitly lays out the "course of proceeding." *See also Abad v. Cozza*, 128 Wn.2d 575, 588, 911 P.2d 376 (1996) (applying RCW 2.28.150 to uphold local court rule filling procedural gap in the CrRLJs).

On appeal, RAPs 9.10 and 9.11 govern supplementing the record with additional evidence after the perfection deadlines have passed. RAP 9.10 addresses materials

already in the trial court record, and RAP 9.11 addresses evidence outside the trial court record. These RAPs do not apply to PRPs. *See* RAP 16.17, 16.15 (specifying which RAPs apply to PRPs). But, under RCW 2.28.150, this court may adopt or modify them if doing so would be "conformable to the spirit" of Title 16 RAP.

There is no need to apply RAP 9.10 to PRPs because RAPs 16.7(a)(3) and 16.9(a) adequately achieve the same result for matters already contained in the trial court record. No RAPs, applicable to PRPs, address adding new evidence to the record. But one RAP, not applicable to PRPs, does: RAP 9.11.

We note that our Supreme Court recently hinted that RAP 9.11 might be useful for considering a motion to supplement the PRP record. *See In re Pers. Restraint of Dodge*, 198 Wn.2d 826, 837 n.4, 502 P.3d 349 (2022). Applying some of the criteria listed in RAP 9.11 for adding evidence to the appellate record would conform to the spirit of Title 16 RAP and PRPs generally.

The spirit of Title 16 RAP and PRPs generally has been previously described by our Supreme Court. "Personal restraint petitions are not a substitute for appeals." *In re Pers. Restraint of Haverty*, 101 Wn.2d 498, 504, 681 P.2d 835 (1984). "[W]e have recognized that a PRP cannot be allowed to deteriorate into a writ of appeal, allowing a petitioner to institute appeal after appeal." *In re Pers. Restraint of Taylor*, 105 Wn.2d

683, 686, 717 P.2d 755 (1986). "[C]ollateral relief undermines the principles of finality

of litigation, degrades the prominence of the trial, and sometimes costs society the right to

punish admitted offenders. These are significant costs which require that collateral relief

be limited." *Hews*, 99 Wn.2d at 86. "We have likewise recognized the need to protect

against constitutional errors actually prejudicing the petitioner." *Taylor*, 105 Wn.2d at

686. "[T]o balance these interests, collateral attacks on convictions, whether based on

constitutional or nonconstitutional grounds, are limited, but not so limited as to prevent

the consideration of serious and potentially valid claims." *In re Pers. Restraint of Cook*,

114 Wn.2d 802, 809, 792 P.2d 506 (1990). "Thus, we have sought to achieve a balance

between the interest in error-free trials and the interest in finality of judgments." *Taylor*,

105 Wn.2d at 686. Given the limited nature of collateral attacks, the strong policy

favoring finality, and the fact that the petitioner has already had a full review on the

merits and ample time to marshal his evidence, it is appropriate for this court to set some

boundaries on the petitioner's (and the State's) ability to submit additional evidence.

Thus, this court may, and moreover should, set appropriate boundaries for submitting

evidence in PRPs.

> *Application of some RAP 9.11 criteria to Mr. Ramirez's motions to supplement*
>
> Under RAP 9.11, the court may supplement the record if:

33

(1)  additional proof of facts is needed to fairly resolve the issues on review,

(2)  the additional evidence would probably change the decision being reviewed,

(3)  it is equitable to excuse a party's failure to present the evidence to the trial court,

(4)  the remedy available to a party through postjudgment motions in the trial court is inadequate or unnecessarily expensive,

(5)  the appellate court remedy of granting a new trial is inadequate or unnecessarily expensive, and

(6)  it would be inequitable to decide the case solely on the evidence already taken in the trial court.

An appellate court will accept new evidence only if all six conditions are met.

*State v. Ziegler*, 114 Wn.2d 533, 541, 789 P.2d 79 (1990).[6]

### 1.    *First motion to supplement the record*

Mr. Ramirez filed his first motion to supplement after the court had called for a response from the State, but before the State had filed its response.  In practice, this court liberally grants motions to amend the petition prior to the State filing its response, even

---

[6] We encourage the Appellate Court Rules Committee to promulgate and adopt a rule that addresses supplementation of the PRP record.  The rule might liberally allow the PRP record to be supplemented if done before a responsive brief is filed, but set limits on supplementing the record thereafter.

With respect to the latter, we suspect the policy considerations for PRPs can be achieved by requiring less than all of the RAP 9.11 criteria to be met.  Such a rule might require the movant to establish: (1) that the new facts are necessary to fairly resolve the issues on review, (2) why it is equitable to excuse the party's failure to submit the new facts earlier, and (3) why it would be inequitable to decide the PRP without the new facts.

after the time bar has expired, provided the amendment would not render the initial petition "mixed." Part and parcel of the ability to amend the petition is the ability to supplement the record in support of that amendment. Given the status of the petition at this stage and our customary practice, it may not make sense to apply RAP 9.11 at this stage. Accordingly, we grant the first motion to supplement as being in keeping with the accepted and usual course of proceedings.

We now consider the State's motion to strike. The State did not respond to the first motion to supplement and instead filed a motion to strike the supplement approximately 40 days after the response deadline. The State did not offer any reason for why it did not respond to the motion or ask for leave to file an untimely response to the motion. We deny the State's motion to strike and allow the record to be supplemented with Dr. Loftus's report, his CV, and Mr. Hritsco's docket from his 2002 third degree theft conviction.

### 2. *Second motion to supplement the record*

Mr. Ramirez filed his second motion to supplement together with his reply brief. The second supplement contains three groups of documents. The first group contains a nonexecuted copy of the plea agreement that Mr. Hritsco entered into as part of his felony case. The second group is an e-mail from the Spokane County District Court stating that

35

the only court record remaining from the Mr. Hritsco's misdemeanor is the docket. The third group is a pair of e-mails from the prosecutors assigned to Mr. Ramirez's case mentioning they were open to plea negotiations.

We deny in part and grant in part Mr. Ramirez's second motion to supplement. We deny supplementation as to Mr. Hritsco's plea agreement and the district court e-mail. As explained in a later section, these items are not necessary to fairly resolve the issues on appeal. But we grant supplementation as to the e-mails between counsel about plea discussions. These e-mails were submitted in rebuttal to evidence the State submitted in its response, they were timely offered by Mr. Ramirez, and it would be inequitable to decide the case without these new facts.

### 3. *Third motion to supplement the record*

Mr. Ramirez's third motion seeks to admit three groups of documents: (1) reports from his chapter 10.77 RCW evaluation, (2) WASPC's 2015 model policy on eyewitness identification and the Spokane County Sheriff's Office's 2021 policy on eyewitness identification, and (3) a declaration from a defense investigator with attachments.

We deny in part and grant in part Mr. Ramirez's third motion to supplement. Mr. Ramirez offers no explanation why the first group of documents—reports that have been available to him for several years—were not submitted earlier. For this reason, we will

36

not consider them. The second group of documents (unsigned declarations) are not evidence, so they are not necessary to fairly resolve the issues on review. For this reason, we will not consider them.

But the policies on eyewitness identification were called to our attention by amicus curiae during the direct appeal and this court has already granted a motion incorporating them into the record on appeal. Therefore, we will consider the policies for eyewitness identification.

We now address the merits of Mr. Ramirez's PRP.

## ANALYSIS

### PRP STANDARD OF REVIEW FOR INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

To obtain relief in a personal restraint petition, Mr. Ramirez must show actual and substantial prejudice resulting from alleged constitutional errors or, for alleged nonconstitutional errors, a fundamental defect that inherently results in a complete miscarriage of justice. *Cook*, 114 Wn.2d at 813. To avoid dismissal, the petitioner must support claims with facts and not merely bald or conclusory allegations. *Id*. at 813-14. The supporting evidence must be based on "more than speculation, conjecture, or inadmissible hearsay," and failure to meet this calls for dismissal of the petition. *Rice*, 118 Wn.2d at 886. This court will dismiss a petition if it "fails to present an arguable

basis for collateral relief either in law or in fact, given the constraints of the personal restraint petition vehicle." *In re Pers. Restraint of Khan*, 184 Wn.2d 679, 686-87, 363 P.3d 577 (2015).

As to his ineffective assistance of counsel claims, we review such claims de novo and apply the same standard as we do on direct appeal. *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 538, 397 P.3d 90 (2017). To prevail, Mr. Ramirez has the burden of showing his counsel's performance fell below an objective standard of reasonableness and that in the absence of counsel's deficiencies, there is a reasonable probability that the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

With respect to deficient performance, a defendant must overcome a strong presumption that counsel's performance was reasonable. *State v. Breitung*, 173 Wn.2d 393, 398, 267 P.3d 1012 (2011). "'When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient.'" *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856, 863, 215 P.3d 177 (2009)).

With respect to prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 U.S.

38

86, 104, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) (quoting *Strickland*, 466 U.S. at 693).

"Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial

whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687).  In other words,

"[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at

112. "We need not consider both prongs of *Strickland* (deficient performance and

prejudice) if a petitioner fails on one." *In re Pers. Restraint of Crace*, 174 Wn.2d 835,

847, 280 P.3d 1102 (2012).

1. *Failure to challenge the admissibility of Mr. Hritsco's identification of Mr. Ramirez on evidentiary and due process grounds*

On direct appeal, Mr. Ramirez argued that the trial court should have excluded the

identification under ER 403, the federal due process clause, and Washington's due

process clause.  This court declined to reach the ER 403 claim and the Washington due

process claim, and rejected the federal due process claim on the merits.  Here, Mr.

Ramirez re-raises each of the claims under the framework of ineffective assistance of

counsel and also adds new ineffective assistance claims under ER 602 and ER 701.  None

of these bases merit relief.

> a.      *Mr. Ramirez fails to adequately brief and argue his ER 403, 602, and 701 claims*

On appeal, this court declined to address the ER 403 argument, finding it unpreserved.  In his petition, Mr. Ramirez claims that counsel should have moved to exclude the identification under ER 403 and also under ER 602[7] and ER 701.[8]  This argument fails to merit consideration because Mr. Ramirez does not adequately brief the issue.

Mr. Ramirez does not cite any existing Washington precedent applying these court rules or attempt to apply them to the facts of this case.  The section of Mr. Ramirez's petition addressing these court rules is just a string citation to seven cases, all from out of state.  Mr. Ramirez does not analyze these cases, attempt to explain why they should be considered persuasive under existing Washington case law applying ER 403, 602, and 701, or attempt to apply them to the facts of this case.  "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

Of the seven cases cited by Mr. Ramirez, four do not cite ER 403, 602, or 701.  One mentions ER 403 in passing: *Perry v. New Hampshire*, 565 U.S. 228, 247, 132 S. Ct.

---

[7] Witnesses must testify from personal knowledge.
[8] Witness opinions must be "rationally based on the perception of the witness."

716, 181 L. Ed. 2d 694 (2012). One mentions ER 602 and 701 in passing and remanded

for an ER 403 hearing on eyewitness reliability without mandating a particular outcome:

*New Jersey v. Chen*, 208 N.J. 307, 27 A.3d 930 (2011). One contains a thorough

discussion of all three court rules applied to eyewitness identification and remanded for

an admissibility hearing to apply the new standards adopted in that opinion: *Oregon v.*

*Lawson*, 352 Or. 724, 765-68, 291 P.3d 673 (2012).

Given its thorough discussion of these issues, *Lawson* would potentially be

persuasive and instructive if Mr. Ramirez attempted to apply it to the facts of this case

and to harmonize it with existing Washington precedent. But again, Mr. Ramirez makes

no attempt to explain why this court should extend Oregon's standards to Washington.

Even if Mr. Ramirez had attempted to harmonize *Lawson* with Washington law,

this is not the proper vehicle for advancing the law. "A personal restraint petition . . . is

not a substitute for an appeal." *In re Pers. Restraint of Hagler*, 97 Wn.2d 818, 824, 650

P.2d 1103 (1982). Instead, the petitioner must demonstrate their entitlement to relief

within the procedural "constraints of the personal restraint petition vehicle." *Khan*,

184 Wn.2d at 687.

*Lawson* comes to this court in a collateral attack under the framework of

ineffective assistance of counsel. For Oregon, *Lawson* was self-admittedly a "novel" and

41

"complex" change in the law that expressly overruled prior case law. 352 Or. at 765. It is well established that trial counsel does not provide deficient performance for failing to anticipate or argue for a change in existing law. *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 938-39, 952 P.2d 116 (1998); *State v. Slighte*, 157 Wn. App. 618, 624, 238 P.3d 83 (2010), *vacated on remand*, 164 Wn. App. 717, 267 P.3d 401 (2011); *State v. Pearsall*, 156 Wn. App. 357, 361-62, 231 P.3d 849 (2010), *vacated on remand*, 164 Wn. App. 720, 267 P.3d 402 (2011). Accordingly, trial counsel cannot be faulted for failing to seek adoption of Oregon precedent and requesting suppression under the laws of another state. Thus, even if this court were to reach the merits of Mr. Ramirez's evidence rule claims, *Lawson* and the other out-of-state cases relied on by Mr. Ramirez do nothing to prove that counsel was deficient by not arguing for suppression under ER 403, 602, and/or 701.

To prove deficient performance, Mr. Ramirez needed to show that under existing Washington law, suppression would have been required under ER 403, 602, and/or 701. Mr. Ramirez has not met this burden.

> b.      *Mr. Ramirez fails to address why he meets the criteria for reconsidering his recast federal due process claim*

The federal due process clause of the Fourteenth Amendment to the United States Constitution offers some protection against mistaken eyewitness identifications. It bars admission of eyewitness identification evidence obtained through suggestive police

procedures, unless the evidence is nevertheless reliable under the totality of the circumstances. U.S. CONST. amend. XIV, § 1; *Manson v. Brathwaite*, 432 U.S. 98, 113, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). In *Brathwaite*, the court held that the Fourteenth Amendment compels exclusion of eyewitness evidence that (1) was obtained by an unnecessarily suggestive police procedure and (2) lacks reliability under the totality of circumstances. 432 U.S. at 112-13.

Mr. Ramirez argues his trial counsel was ineffective for failing to move to suppress identification evidence under the federal due process clause. He made a similar argument that we rejected on direct appeal.

A petitioner generally "'may not renew an issue that was raised and rejected on direct appeal'" by "recasting" it as a claim of ineffective assistance of counsel. *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 719-20, 16 P.3d 1 (2001) (quoting *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 303, 868 P.2d 835 (1994)).[9] "[S]imply recasting an argument in that manner does not create a new ground for relief or constitute good cause for reconsidering the previously rejected claim." *Id.* at 720. In order to renew an issue

---

[9] The general prohibition on recasting claims does not apply to Mr. Ramirez's court rule arguments and his Washington Constitution argument because this court rejected them without reaching the merits. *Taylor*, 105 Wn.2d at 687 (prohibition only applies if "'the prior determination was on the merits'") (quoting *Haverty*, 101 Wn.2d at 503)).

directly, or derivatively via an ineffective assistance claim, the petitioner must show that "'the interests of justice require relitigation of that issue.'" *Id.* at 719 (quoting *Lord*, 123 Wn.2d at 303).

"The interests of justice are served by reconsidering a ground for relief if there has been 'an intervening change in the law or some other justification for having failed to raise a crucial point or argument in the prior application.'" *Yates*, 177 Wn.2d at 17 (internal quotation marks omitted) (quoting *Stenson*, 142 Wn.2d at 720). "A petitioner may not avoid this requirement 'merely by supporting a previous ground for relief with different factual allegations or with different legal arguments.'" *Id.* (quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671, 101 P.3d 1 (2004)).

Although Mr. Ramirez does not address *Stenson*, *Yates*, *Lord*, or any of the well-established case law barring petitioners from re-raising issues, he recently filed a supplemental citation of authority, citing our Supreme Court's recent case of *State v. Derri*, No. 100038-3 (Wash. June 23, 2022), https://www.courts.wa.gov/opinions/pdf/1000383.pdf. We address *Derri* for the purpose of deciding whether the rule announced therein justifies our reviewing the federal due process claim here.

In *Derri*, the court decided whether trial courts must consider new scientific research, developed after the 1977 *Brathwaite* decision, when applying that federal due

44

process clause test. *Derri*, slip op. at 2. In its decision, the court noted that mistaken eyewitness identification is a leading cause of wrongful conviction. *Id.* at 16. Further, in the 45 years since *Brathwaite*, researchers have conducted hundreds more empirical studies relating to the reliability of eyewitness evidence. *Id.* at 18. This research has greatly enriched what we know about the accuracy and reliability of eyewitness identifications, including that rates of error in making identifications are much higher when a person is asked to identify someone of another race. *Id.* For these reasons, the court held that trial courts using the *Brathwaite* test must apply relevant, widely accepted modern science on eyewitness identification for each step of the *Brathwaite* test. *Id.* at 19.

*Derri* does not justify reviewing Mr. Ramirez's federal due process claim. On direct appeal, this court rejected Mr. Ramirez's due process claim under *Perry*, because it was not clear that the *Brathwaite* test even applied under the circumstances presented in this case. *Ramirez*, 5 Wn. App. 2d at 132-33. *Derri* did not address *Perry* and its threshold question of whether the *Brathwaite* test applied to these circumstances. Furthermore, the eyewitness identification issue here is constrained by being brought within an ineffective assistance of counsel claim. To the extent that *Derri* announces new

45

or clarified standards for eyewitness identification, counsel cannot have been ineffective for failing to anticipate it. *Benn*, 134 Wn.2d at 939.

Even if *Brathwaite* and *Derri* could be said to apply, this is not a case where trial counsel failed to recognize the problematic nature of Mr. Hritsco's identification. The record reflects that defense counsel, in consultation with each other, decided on a reasonable trial strategy to argue that the late identification lacked credibility. While defense counsel had "nothing to lose" by bringing the motion urged in this petition, that is not the test for ineffective assistance of counsel. *Knowles v. Mirzayance*, 556 U.S. 111, 122, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009) ("This Court has never established anything akin to the Court of Appeals' 'nothing to lose' standard for evaluating *Strickland* claims."). Even before *Knowles*, it was well established in this state that "[n]ot every possible motion to suppress has to be made." *State v. Nichols*, 161 Wn.2d 1, 14, 162 P.3d 1122 (2007). "In [*State v. McFarland*, 127 Wn.2d 322, 336-36, 899 P.2d 1251 (1995)], we rejected the premise that failing to move to suppress any time there is a question as to the validity of a search or seizure is per se deficient performance." *Id*. *Knowles* and *McFarland* further limit *Derri*'s relevance to this claim of ineffective assistance of counsel.

For these reasons, we conclude that collateral review of this issue is barred. *In re Pers. Restraint of Knight*, 196 Wn.2d 330, 342, 473 P.3d 663 (2020).

### c. *Mr. Ramirez's state constitutional claim lacks merit*

In addition to claiming that trial counsel should have raised a Fourteenth Amendment challenge to the admissibility of Mr. Hritsco's identification of Mr. Ramirez, Mr. Ramirez also argues that counsel should have raised the same under Washington's corollary constitutional provision. CONST. art. I, § 3. Regarding the state constitution, this court observed on direct appeal that no case has yet imposed stricter eyewitness identification standards under Washington's Constitution than what exists under the federal constitution and that "it was neither obvious nor foreseeable that Mr. Hritsco's testimony should have been excluded on independent state constitutional grounds." *Ramirez*, 5 Wn. App. 2d at 134. Again, it is well established that counsel does not provide deficient performance for failing to anticipate or argue for a change in existing law. *Benn*, 134 Wn.2d at 939; *Slighte*, 157 Wn. App. at 624; *Pearsall*, 156 Wn. App. at 361-62. Accordingly, trial counsel cannot be faulted for failing to move for suppression under Washington's Constitution. We reject Mr. Ramirez's ineffective assistance of counsel claim premised on our state constitution's due process clause.

        *d.      Innocence Project's amicus brief*

On direct appeal and again in this court, the Innocence Project has filed an amicus

brief addressing the unreliability of Mr. Hritsco's identification of Mr. Ramirez as

"Demon."

On appeal, the Innocence Project pointed out several areas where Mr. Hritsco's

three identification procedures fell short of the ideal procedure, leading to the possibility

that the identification was the result of false memory. Amicus then appeared to urge this

court to adopt a rule requiring trial courts to sua sponte analyze eyewitness identification

evidence for reliability before admitting it at trial.

Here, on collateral review, the Innocence Project again points out all the ways that

the identification procedures that occurred here fell short of the ideal procedures. Amicus

also points out decades of case law and social scientific research discussing the risks of

faulty eyewitness identification. Based on the questionable procedures used here and

well-established precedent that should have alerted counsel to these questionable

procedures, the Innocence Project argues that counsel was deficient for failing to move to

suppress this evidence as unreliable.

Ultimately, amicus falls victim to the same defects that plague Mr. Ramirez's

briefs. Amicus does not analyze ER 403, 602, or 701 to show that a motion to suppress

would have succeeded under these court rules.  Amicus does not analyze the relevant federal constitutional case law, addressed in this court's prior opinion, to show that a motion to suppress would have succeeded under the federal constitution.  Amicus is silent on Washington's Constitution.

Amicus expertly demonstrates that faulty eyewitness identification is a real ill that has been recognized long enough by the courts such that competent counsel should be aware of the issue.  But this is not a case where counsel was oblivious to the risks of such faulty identification evidence.

Rather, this is a case where counsel—aware of the risks—made a conscious decision to use Mr. Hritsco's inconsistent late-hour identification to attack Mr. Hritsco's credibility.  Counsel reasonably expected the jury to discount Mr. Hritsco's identification of Mr. Ramirez.  In his opening statement to the jury, defense counsel highlighted the many inconsistencies of Mr. Hritsco's physical description of "Demon" to police and his client's physical characteristics and also highlighted Mr. Hritsco's dubious late-hour identification.

The jury may well have given little weight to Mr. Hritsco's dubious identification of Mr. Ramirez.  If so, it would have instead relied on (1) Mr. Ramirez's implied threat to kill his uncles sent by text a few months before the murders; (2) the 49 undeleted voice

calls and texts exchanged between Arturo and Mr. Ramirez on November 1, 2014, the day

of the murder, showing that Mr. Ramirez planned to visit his uncle that night; (3) Mr.

Ramirez's DNA on the bloody knit cap and glove found on his uncle's bed; (4) Mr.

Ramirez's presence near the apartment at the time of his uncles' murders; (5) Mr.

Ramirez leaving the area soon after the murders; (6) "Demon's" conversation with Mr.

Hritsco about finding a ride and asking for directions to the bus station; (7) Mr. Ramirez's

call around this time to the bus station; and (8) Mr. Ramirez being one of five people in

Spokane known by law enforcement as "Demon."

Even were we to agree with Mr. Ramirez or amicus that deficient representation

occurred—and we do not—a criminal defendant is not prejudiced if the evidence of their

guilt is so overwhelming that the outcome of the case was in no way affected by the

deficiency. *State v. Townsend*, 142 Wn.2d 838, 849, 15 P.3d 145 (2001). Here, the

evidence of Mr. Ramirez's guilt is overwhelming.

2. *Failure to cross-examine Mr. Hritsco on his prior convictions and his prior agreement to cooperate with the State*

"Courts generally entrust cross-examination techniques, like other matters of trial

strategy, to the professional discretion of counsel." *Davis*, 152 Wn.2d at 720. "In

assessing Petitioner's claim that his counsel did not effectively cross-examine a witness,

we need not determine why trial counsel did not cross-examine if that approach falls

within the range of reasonable representation." *Id*. "'In retrospect we might speculate as to whether another attorney could have more efficiently attacked the credibility of . . . witnesses. . . . The extent of cross-examination is something a lawyer must decide quickly and in the heat of the conflict. This . . . is a matter of judgment and strategy.'" *Id*. (alterations in original) (quoting *State v. Stockman*, 70 Wn.2d 941, 945, 425 P.2d 898 (1967)). The petitioner must also "establish the reasonable probability that, but for this probable error, the outcome of his trial would have been different." *Id.*

### a. *Overview of Mr. Hritsco's criminal history*

On January 17, 2002, Mr. Hritsco pleaded guilty to theft in the third degree. The plea was a reduction from a felony charge of forgery. It appears that this was Mr. Hritsco's first criminal offense. Mr. Ramirez had some initial confusion as to whether Mr. Hritsco had a second theft conviction. The State cleared that up and Mr. Ramirez now agrees that there was only one theft conviction. The confusion stemmed from the fact that the crime occurred in 1999 but Mr. Hritsco was not sentenced until 2002 and it was a reduction from superior court down to district court.

On October 30, 2008, Mr. Hritsco pleaded guilty to assault in the second degree and kidnapping in the second degree. He received a concurrent sentence of 15 months on each count.

In 2003, between the misdemeanor theft and felony convictions, Mr. Hritsco had a conviction for reckless endangerment, a gross misdemeanor. Since pleading guilty to the felonies in 2008, Mr. Hritsco has not been charged with or convicted of any crimes.

b. *ER 609 and the two felony convictions*

To admit the felony convictions under ER 609(a), Mr. Ramirez's counsel would have needed to show that they "involved dishonesty or false statement" or "that the probative value of admitting this evidence outweighs the prejudice to the party against whom the evidence is offered."

Mr. Ramirez argues the convictions are admissible under ER 609(a)(1) (probative value outweighs prejudice). We disagree. "[P]rior convictions not involving dishonesty or false statements are not probative of the witness's veracity until the party seeking admission thereof shows the opposite by demonstrating the prior conviction disproves the veracity of the witness." *State v. Hardy*, 133 Wn.2d 701, 708, 946 P.2d 1175 (1997). "'[F]ew prior offenses that do not involve crimes of dishonesty or false statement are likely to be probative of a witness'[s] veracity.'" *Id.* (quoting *State v. Jones*, 101 Wn.2d 113, 120, 677 P.2d 131 (1984), *overruled in part on other grounds by State v. Brown*, 113 Wn.2d 520, 782 P.2d 1013 (1989)).

To determine admissibility, the proponent of admission must apply the *Jones* factors. *Hardy*, 133 Wn.2d at 709. These factors apply to all prior convictions admitted under ER 609(a)(1), regardless of passage of time. *State v. Rivers*, 129 Wn.2d 697, 706, 921 P.2d 495 (1996) (abuse of discretion not to apply the factors before admitting four-year-old second degree assault conviction). The *Jones* factors are:

(1) "[T]he type of crime—crimes of violence are not usually probative of the [witness's] propensity to lie."

(2) "[T]he remoteness of the prior conviction—the older the conviction, the less probative it is of the [witness's] credibility."

(3) "[T]he similarity of the prior crime—the greater the similarity, the greater the possible prejudice."

(4) "[T]he age and circumstances of the [witness]—was the [witness] very young, were there extenuating circumstances?"

(5) "[W]hether the [witness] testified at the previous trial—if the [witness] did not testify, the prior conviction has less bearing on veracity."

(6) "[T]he length of the witness's criminal record—unnecessarily cumulative prior convictions are more prejudicial."

*See Jones*, 101 Wn.2d at 121-22.

*Jones* factors 1, 2, and 4, are useful for assessing probative value. *Hardy*, 133 Wn.2d at 709. Factors 3 and 6 are useful for assessing prejudice. *Id*. at 711. The Supreme Court in *Hardy* did not address factor 5. On its face, factor 5 is related to assessing probative value, but its relevance with respect to probative value seems minimal in light of the fact that inconsistencies in the witness's prior testimony will never be admissible under ER 609. *State v. Coe*, 101 Wn.2d 772, 776, 684 P.2d 668 (1984)

53

("Cross examination on prior convictions under ER 609(a) is limited to facts contained in the record of the prior conviction: the fact of conviction, the type of crime, and the punishment imposed.").

In his initial briefs, Mr. Ramirez does not identify or brief the mandatory *Jones* factors. Mr. Ramirez's brief could be generously construed as addressing *Jones* factors 1 and 2, but contains no analysis that could be imputed under factors 3 through 6. In his supplemental brief, Mr. Ramirez explicitly applies factors 1 and 2 to the misdemeanor conviction, but not the felony convictions, and completely ignores the rest of the factors.

At the trial court level, "[f]ailure to engage in this process on the record is an abuse of discretion." *Rivers*, 129 Wn.2d at 706. If it is an abuse of discretion for a trial court not to expressly consider each of these factors, then it follows that failure to fully brief these factors on appellate review is insufficient to command judicial review. Without this step, Mr. Ramirez cannot meet his burden of showing that this evidence would have been admissible had trial counsel offered it. Without proof that the evidence would have been admissible, this court cannot assess counsel's effectiveness.

c.      *ER 609 and the misdemeanor conviction*

As a crime of dishonesty, Mr. Hritsco's misdemeanor theft conviction satisfies the

requirements of ER 609(a)(2).  Because the crime fits within ER 609(a)(2), Mr.

Ramirez's trial counsel would not have needed to satisfy the *Jones* factors, which only

apply when admitting convictions under ER 609(a)(1).  *See Rivers*, 129 Wn.2d at 705-06.

But, because Mr. Hritsco's theft conviction was more than 10 years old, Mr.

Ramirez's counsel would have needed to satisfy ER 609(b).  Under ER 609(b), Mr.

Ramirez's counsel would have needed to show "in the interests of justice, that the

probative value of the conviction supported by specific facts and circumstances

substantially outweighs its prejudicial effect."  "[T]he evidence is presumed to be

irrelevant to credibility, absent specific facts or circumstances from which the trial court

can determine, in the interest of justice, that the conviction has probative value that

outweighs its prejudicial effect." *State v. Jones*, 117 Wn. App. 221, 233, 70 P.3d 171

(2003).  "[T]he older such a conviction becomes, the less probative value it likely will

have." *Id*.  Also, the younger a person is when they commit the prior offense, "the more

likely it is that the prejudicial effect of the prior convictions will outweigh their probative

value or that there may be extenuating circumstances the trial court should consider."

*State v. Gomez*, 75 Wn. App. 648, 653, 880 P.2d 65 (1994).

Mr. Hritsco's theft conviction was more than 12 years old when the crimes occurred in this case and almost 15 years old at the time Mr. Hritsco testified at trial. Furthermore, the underlying event that gave rise to the theft conviction occurred in 1999, almost three years before that judgment was entered. Mr. Hritsco was also barely 18 years old when he committed the theft. Considering Mr. Hritsco's age at the time he committed the theft and the large intervals of time between the theft and felony convictions and between the felony convictions and Mr. Ramirez's case, it is doubtful that the trial court would have admitted the misdemeanor conviction. The case was too attenuated by youthfulness and the passage of time to be probative of Mr. Hritsco's present credibility.

>    d.    *ER 608 and the felony and misdemeanor convictions*

ER 608(b) authorizes a trial court to admit specific instances of conduct of a witness on cross-examination if probative of truthfulness. Recently, this same panel "h[e]ld that a witness may not be questioned regarding facts leading to a prior conviction under ER 608(b) [instances of conduct to show untruthfulness], since doing so would constitute an end-run around ER 609(a)'s prohibition on presenting collateral evidence." *State v. McBride*, 192 Wn. App. 859, 872, 370 P.3d 982 (2016). Under *McBride*, ER 608 would not have allowed trial counsel to inquire into the circumstances of Mr. Hritsco's

prior plea deal. Accordingly, Mr. Ramirez's trial counsel did not provide deficient performance by not seeking to cross-examine Mr. Hritsco concerning the circumstances of his prior plea.

> e.      *ER 608 and the agreement to cooperate*

Mr. Ramirez argues that Mr. Hritsco's 2007 agreement to cooperate with the State was admissible in Mr. Ramirez's 2016 trial under ER 608(b) (specific instances of conduct) to attack Mr. Hritsco's truthfulness. He fails to satisfactorily explain how an agreement to testify truthfully in one proceeding is probative of untruthfulness in a second proceeding. Mr. Ramirez argues that Mr. Hritsco's felony convictions were not final because Mr. Hritsco had outstanding LFOs and he hoped to curry the State's favor by falsely testifying against Mr. Ramirez. We disagree. First, Mr. Hritsco earned the benefit of his cooperation agreement by testifying against his 2007 codefendants; it did not require him to testify against Mr. Ramirez. Second, there is no evidence beyond pure speculation that Mr. Hritsco's outstanding LFOs were zeroed out in exchange for untruthful testimony. Notwithstanding the dubious identification testimony, there is substantial objective evidence that Mr. Ramirez was the person who spoke with Mr. Hritsco on the night of the murders.

      3.      *Failure to object to the jury instructions and the special verdict form*
                *related to the aggravated murder charges*

Mr. Ramirez argues, and the State tacitly agrees, that the charging information did

not adequately inform Mr. Ramirez that the State would be seeking a life sentence under

chapter 10.95 RCW (aggravated murder). Based on this deficiency in the information,

Mr. Ramirez argues defense counsel should have objected to the trial court instructing the

jury on aggravating circumstances and giving the jury a special verdict form for the

aggravating circumstances.

We do not accept the State's concession. "We are not required to accept an

erroneous concession of law," especially a concession that is "equivocal at best." *State v.*

*Nysta*, 168 Wn. App. 30, 44, 275 P.3d 1162 (2012); *In re Pers. Restraint of Pullman*, 167

Wn.2d 205, 212 n.4, 218 P.3d 913 (2009).

Aggravators that enhance a sentence need to be submitted to a jury and proved

beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. 99, 111, 133 S. Ct. 2151,

186 L. Ed. 2d 314 (2013) (discussing *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct.

2348, 147 L. Ed. 2d 435 (2000)); *see also State v. Allen*, 192 Wn.2d 526, 534-36, 431

P.3d 117 (2018) (holding that RCW 10.95.020 aggravating circumstances must be proved

to a jury beyond a reasonable doubt). But, *Alleyne* and *Apprendi* only dictate what must

be sent to a jury, not how it must be charged. *State v. McEnroe*, 181 Wn.2d 375, 385, 333

P.3d 402 (2014) (explaining that *Alleyne* and *Apprendi* do not govern charging issues because the Fifth Amendment's "guaranty of indictment by grand jury is not binding on the states").

When it comes to charging aggravating factors—even ones that must be proved to a jury beyond a reasonable doubt—do not have to be pleaded in the information. *State v. Siers*, 174 Wn.2d 269, 281, 274 P.3d 358 (2012) (abrogating *State v. Powell*, 167 Wn.2d 672, 223 P.3d 493 (2009) (plurality opinion)). "The United States Constitution does not require states to allege aggravating circumstances in local prosecutions. Neither does the Washington Constitution require aggravators to be alleged in an information." *Id.* All that the law requires is that the defendant receive actual notice, prior to trial, that the State intends to seek an enhanced sentence sufficient that the defendant can prepare a defense. *Id*. at 277-78. The law "does not mandate the manner in which that notice is to be given." *Id.* at 277; *see also McEnroe*, 181 Wn.2d at 384-85 (holding that *Siers* applies to notices to seek the death penalty under chapter 10.95 RCW).[10]

Under *Siers* and *McEnroe*, this court does not apply the well-worn standards and tests for determining whether the information charges a crime, but instead asks if Mr.

---

[10] While aggravating factors do not need to be pleaded in the information, it is customary, and everyone will agree that it is a best practice that prosecutors should follow to avoid issues such as this from occurring.

Ramirez received notice of the State's intent to submit aggravating circumstances to the jury under chapter 10.95 RCW.

Trial counsel declared that early in the case he had multiple discussions with the prosecutor's office, including with the elected prosecutor, about what sentence the State would seek if the case went to trial. Trial counsel further declared that he relayed this information to Mr. Ramirez, including that the State was intending to seek a life sentence under chapter 10.95 RCW. Mr. Ramirez declares that he received no such information from his lawyer prior to trial and only had sentencing discussions with counsel posttrial.

When a fact of consequence is disputed in a PRP, RAP 16.11(b) authorizes the case to be transferred to the superior court for a reference hearing for that court to hear the disputed evidence and enter findings of fact to resolve the dispute. As explained below, the factual dispute here does not involve a fact of consequence.

The State argues there was no prejudice because the court did not sentence Mr. Ramirez under chapter 10.95 RCW. Mr. Ramirez mostly evades the question in both his petition and reply by conflating the mere existence of error with prejudice. Nowhere in his opening brief and reply does Mr. Ramirez explain how he was harmed by this error or what the remedy should be.

For the first time in his supplemental brief, Mr. Ramirez claims that the remedy should be retrial. In support of his claim, he cites *State v. Theroff*, 95 Wn.2d 385, 622 P.2d 1240 (1980).[11] In *Theroff*, the jury returned a special verdict on a firearm enhancement, but the information failed to allege any firearm enhancement. 95 Wn.2d at 392. The remedy applied by the Supreme Court was resentencing to strike the enhancement, not retrial. *Id.* at 393. *Theroff* thus does not support Mr. Ramirez's requested remedy and explicitly contradicts his claim of prejudice.[12]

Finally, it should be observed that the Supreme Court rejected Mr. Ramirez's proposed remedy in dicta in *State v. Siers*, 158 Wn. App. 686, 244 P.3d 15 (2010), *rev'd*, 174 Wn.2d 269 (2012). In *Siers*, Division One of this court reversed the defendant's underlying assault convictions because the information did not include the Good Samaritan aggravator found by the jury. *Siers*, 158 Wn. App. at 703. The majority took the position that the aggravator's elements became essential elements of the assaults and were not severable. Judge Dwyer argued in a vigorous dissent that reversing the assault

---

[11] *Theroff* was decided prior to *Siers* and at a time when existing case law required aggravators to be charged in the information. *Siers* and *McEnroe* implicitly overruled *Theroff*.

[12] In his amended supplemental brief, Mr. Ramirez apparently abandons *Theroff* and relies on several other cases for the proposition that giving an erroneous aggravating circumstances instruction warrants a new trial. As mentioned earlier, the aggravating circumstances instruction was not erroneous, so we decline to discuss those additional authorities.

convictions would yield an improper windfall because Siers received a standard range sentence and the aggravator had no identifiable impact on the assault convictions. When the Supreme Court took the case, the five-justice majority quoted Judge Dwyer's dissent several times with approval, but decided the case on the alternative ground that the aggravator did not need to be charged in the information. *Siers*, 174 Wn.2d at 276-77. Because Siers acknowledged receiving actual notice, no error occurred, and adoption of Judge Dwyer's harmless error analysis was unnecessary. Significant here, the four-justice concurrence would have avoided the question of how to charge aggravators and adopted Judge Dwyer's harmless error analysis. *Id*. at 284-85 (Stephens, J., concurring).

Assuming, without deciding, that Mr. Ramirez received improper notice of the aggravating circumstance and that counsel was deficient in failing to object, Mr. Ramirez has failed to show prejudice. This failure renders the factual dispute of whether he received proper notice from defense counsel inconsequential. Because the prejudice prong fails, we do not address the deficient performance prong. *Crace*, 174 Wn.2d at 848.

> 4. *Failure to inform Mr. Ramirez of the potential maximum sentence for aggravated murder*

Mr. Ramirez asserts he received ineffective assistance of counsel because defense counsel failed to advise him that he risked life in prison or the death penalty. He argues

62

this failure prejudiced him because it deprived him of his ability to accurately weigh the State's plea offers or enter plea negotiations. We conclude that Mr. Ramirez cannot show prejudice and reject this ineffective assistance of counsel claim.

In addressing both deficient performance and prejudice, Mr. Ramirez relies solely on *State v. Estes*, 188 Wn.2d 450, 395 P.3d 1045 (2017). In *Estes*, defense counsel performed deficiently because he was completely unaware until after trial that Estes was facing his third strike under the Persistent Offender Accountability Act of the Sentencing Reform Act of 1981, chapter 9.94A RCW.

Regarding prejudice, the Supreme Court observed that the right to effective assistance of counsel extends to plea bargaining. "Counsel must, at a minimum, 'reasonably evaluate the evidence against the accused and the likelihood of a conviction if the case proceeds to trial so that the defendant can make a meaningful decision as to whether or not to plead guilty.'" *Estes*, 188 Wn.2d at 464 (quoting *State v. A.N.J.*, 168 Wn.2d 91, 111-12, 225 P.3d 956 (2010)). "Uncertainty about the outcome of plea bargain negotiations should not prevent reversal where confidence in the outcome is undermined." *Id*. In *Estes*, as in this case, the defendant outright refused to engage in plea negotiations.

Despite Mr. Estes refusing to engage in negotiations, the Supreme Court still reversed his convictions. The court reversed by taking the focus away from whether the State would have offered a better plea deal and by putting the focus on the defendant. "[W]e need not be 100 percent sure that the outcome would have been different to find prejudice"—just a "reasonabl[e] probab[ility] that had [the defendant] known that there was a much higher chance that he would be spending life in prison, the result of the proceeding would have differed." *Id*. at 466.

*Estes* is distinguishable. Estes was found guilty of assault in the third degree and felony harassment—both class C felonies. It was the inclusion of deadly weapon enhancements that transformed the case into a third strike. At most, Mr. Estes believed that he was only facing up to 5 years in prison, perhaps 10 years, if there were grounds for running the counts consecutively.

Here, assuming without deciding that Mr. Ramirez was operating under the mistaken belief that he was facing a standard range sentence, Mr. Ramirez knew that his standard range was 771-988 months. Even at the low-end, a sentence of 771 months (64.25 years) would be well in excess of a de facto life sentence for Mr. Ramirez, who was 32 years old on the offense date. *See State v. Haag*, 198 Wn.2d 309, 313, 495 P.3d 241 (2021) (46-year sentence for a 17 year old was a de facto life sentence). Mr. Ramirez

had just as much incentive to plea bargain in the face of this standard range sentence as he did had he known he faced a mandatory life sentence. It strains credulity to argue otherwise. Unlike Mr. Estes, Mr. Ramirez knew he was facing a standard range sentence that was, at the low end, still well above a de facto life sentence. On this record, "confidence in the outcome" is not undermined by counsel's alleged failure to accurately advise. *Estes*, 188 Wn.2d at 464.

5. *Deprivation of counsel at sentencing*

Mr. Ramirez argues that defense counsel failed to advocate for him at sentencing, which is a complete deprivation of counsel and per se prejudicial under *United States v. Cronic*, 466 U.S. 648, 656, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984). We agree that Mr. Ramirez is entitled to resentencing.

The previous issues were all analyzed under the framework of ineffective assistance of counsel, governed by *Strickland*. Regarding this issue, Mr. Ramirez does not claim a *Strickland* violation; instead, he raises a *Cronic* violation. *Cronic*, decided the same day as *Strickland*, governs total and near-total deprivations of counsel—situations where counsel is little more than "a warm body with a bar card." *State v. Anderson*, 19 Wn. App. 2d 556, 562, 497 P.3d 880 (2021).

On direct appeal, *Cronic* violations are considered per se prejudicial. These situations include (1) denial of counsel at a critical stage of proceedings, (2) where "'counsel entirely fails to subject the prosecution's case to meaningful adversarial testing,'" and (3) where counsel is put in a situation where competent counsel very likely could not render effective assistance (e.g., insufficient time to prepare for trial). *Bell v. Cone*, 535 U.S. 685, 695-96, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) (quoting *Cronic*, 466 U.S. at 659).

On collateral attack, the burden shifts and the petitioner must prove actual and substantial prejudice. "[W]e decline to adopt any rule which would categorically equate per se prejudice on collateral review with per se prejudice on direct review." *In re Pers. Restraint of St. Pierre*, 118 Wn.2d 321, 329, 823 P.2d 492 (1992). Recently in *Rhem*, our Supreme Court re-affirmed *St. Pierre* and held that public trial violations, which are considered structural on direct appeal, require proof of actual and substantial prejudice when raised for the first time in a personal restraint petition. *Rhem*, 188 Wn.2d at 329-30.[13] The one exception to this rule is when the petitioner raises the error within the framework of ineffective assistance

---

[13] The same rule applies in federal habeas cases. *See, e.g.*, *United States v. Jingles*, 702 F.3d 494, 502-03 (9th Cir. 2012) (automatic reversal rule applicable to double jeopardy violations on direct appeal did not apply to habeas petition).

of appellate counsel. *In re Pers. Restraint of Orange*, 152 Wn.2d 795, 804, 814,

100 P.3d 291 (2004) (distinguishing *St. Pierre*).

Because Mr. Ramirez does not claim ineffective assistance of appellate

counsel, *St. Pierre* and *Rhem* apply. Thus, assuming a *Cronic* violation occurred,

Mr. Ramirez must still show actual and substantial prejudice.

Here, a *Cronic* violation occurred at sentencing. The State asked for the

high end of the standard range and defense counsel just asked for a $5 per month

payment plan. Counsel did not even make a perfunctory request for the low end of

the standard range. Furthermore, counsel had ample fodder to justify requesting a

much lower sentence. Mr. Ramirez was initially found incompetent to stand trial

and had to be restored to competency. Severe mental illness and the need for

competency restoration are regularly and successfully argued as bases for

mitigated sentences in this state. In this instance, counsel "'entirely fail[ed] to

subject the prosecution's [recommendation] to meaningful adversarial testing.'"

*Bell*, 535 U.S. at 696.

The question now turns to prejudice. In the sentencing context, actual and

substantial prejudice requires evidence demonstrating a likelihood that the trial court

would have imposed a lesser sentence had one been requested. *In re Pers. Restraint of*

67

No. 37774-1-III
*Pers. Restraint of Ramirez*

*Meippen*, 193 Wn.2d 310, 314-17, 440 P.3d 978 (2019). A "mere possibility" that the trial court would have imposed a lesser sentence is insufficient to make a prima facie showing of actual and substantial prejudice. *Id*. at 317. Had counsel raised these mental health issues at sentencing, history suggests there would have been more than a mere possibility of a lesser sentence. We conclude that a *Cronic* violation occurred and sufficient prejudice exists to merit resentencing.

Affirmed in part; remanded for resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, A.C.J.

WE CONCUR:

_____
Fearing, J.

_____
Staab, J.

68